[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-10371
_____

D.C. Docket No. 0:15-cv-60280-JIC


JOYCE D. HIGGS,

Plaintiff - Appellee
Cross - Appellant,

versus

COSTA CROCIERE S.P.A. COMPANY,

Defendant - Appellant
Cross - Appellee.


_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(August 14, 2020)

Before WILSON, MARCUS and BUSH,* Circuit Judges.

---

* Honorable John Kenneth Bush, United States Circuit Judge for the Sixth Circuit, sitting by designation.

MARCUS, Circuit Judge:

On Christmas Eve, 2014, Joyce Higgs tripped over a bucket in a dining area of the cruise ship Costa Luminosa and sustained serious injuries to her left shoulder.  She sued the cruise company, defendant Costa Crociere ("Costa"), for negligently placing the bucket behind a corner in a highly-trafficked area, and on September 27, 2018, a jury returned a verdict in her favor for over $1 million.

Costa challenges that verdict, arguing that the district court should have granted it judgment as a matter of law because Higgs failed to show that the cruise ship had notice of the hazard posed by the bucket.  In the alternative, Costa claims that it is entitled to a new trial because the district court improperly addressed discovery disputes between the parties, unfairly prejudicing it at trial.  After careful review, and with the benefit of oral argument, we find these arguments unpersuasive and affirm the verdict in Higgs's favor.

The more difficult question comes to us as a cross-appeal.  Specifically, Higgs argues that the district court erred in reducing the jury's award of compensatory damages for past medical expenses from the amount the jury found to be reasonable -- and which closely approximated the amount billed by Higgs's healthcare providers (roughly $61,000) -- to the much lower amount actually paid in satisfaction of those charges by her and her insurer (some $16,000).  This claim raises a question of first impression under maritime law.  We hold that the

2

appropriate measure of medical damages in a maritime tort case is that reasonable value determined by the jury upon consideration of any relevant evidence, including the amount billed, the amount paid, and any expert testimony and other relevant evidence the parties may offer. Because the district court improperly reduced Higgs's damages by applying a bright-line rule that would categorically limit medical damages to the amount actually paid by an insurer, we vacate the district court's reduction of the medical damages award and remand for entry of judgment in the amount the jury found to be reasonable.

## I.

On the morning of December 24, 2014, Joyce Higgs was on the fourth day of a Caribbean cruise with her family, including her daughter, son-in-law, and grandson. Higgs and her daughter, Christina Bartolo, were the first out of their rooms that morning. They went to the ship's breakfast buffet, where Higgs went to pick up food while Christina saved a table. As Higgs was returning from the buffet line and turning left around a busboy station, she was forced to take a step towards the station as diners at a nearby table moved their chairs back to stand. One or two steps around the corner of the station, while walking on a carpeted pathway, Higgs tripped over a cleaning bucket that she had not seen and sustained injuries to her shoulder, fracturing her humerus. She spent the remainder of the cruise bed-

3

bound, and she has been in and out of the offices of doctors and physical therapists ever since.

Higgs's grandson, Domingo Bartolo Jr., arrived on the scene shortly after the incident. He testified in his deposition, which was played for the jury, that his efforts to photograph the bucket over which his grandmother had tripped were frustrated by a female security officer who was taking photos of her own. Costa disputes this account. It says that the female security officer -- Kavita Kamble -- investigated the incident but took no contemporaneous photos of the scene. Instead, Costa claims that the only photos of the area were taken the following evening and reflect Kamble's own halfhearted attempt to reconstruct the scene -- the photos show the water bucket not behind the corner but in front of it, clearly visible on approach from the buffet. Both parties agree this does not depict the bucket's location when Higgs tripped over it on December 24. Domingo Jr. also testified that he saw Kamble take down the names of eyewitnesses. In the end, Kamble composed an investigation report that blamed Higgs's poor judgment and inattentiveness for the accident.

Higgs filed her complaint against Costa in the United States District Court for the Southern District of Florida, alleging negligence under federal maritime law, on February 11, 2015. Discovery disputes began between the parties the following year. Costa did not disclose Kamble's identity in its initial disclosures,

nor did it turn over the photos it concedes she took.  Citing Domingo Jr.'s deposition testimony, Higgs moved to compel production of "contemporaneous photographs of the scene" on January 29, 2016.  Costa responded by asserting work product privilege and denying that the photos it had were "contemporaneous"; rather, it stated, they "were taken 1 to 2 days later."  A magistrate judge found that Higgs's need for the photos, coupled with the fact that Costa had prevented her from taking her own, were sufficient to overcome any work product privilege.  The court ordered Costa to "produce, within three days of this Order, copies of those photographs which were taken on December 24, 2014 and December 25, 2014, and which depict the scene of the incident as it existed on December 24, 2014."

But Costa didn't produce anything in response.  Instead, it had Kamble execute an affidavit stating that the only photographs she took did not depict "the scene of Mrs. Higgs' incident as it existed on December 24, 2014 at the moment the guest fell," nor were they "designed to depict the scene of Mrs. Higgs' incident."  Costa did not reveal this affidavit to anyone else and responded to the judge's order by denying, without elaboration, that it possessed any responsive photographs.

Higgs did not press the matter further, and the case proceeded to trial in March 2016.  Costa did not call Kamble as a witness or introduce her photographs

5

into evidence.  At trial, Costa's corporate representative testified that "there should never be a bucket on the carpet" and that the buckets must be "tucked to the [busboy] stations" to minimize the risk of tripping.  The jury returned an approximately $1.1 million verdict for Higgs, finding her to be 15% at fault for the accident.  Costa appealed, and a panel of this Court reversed and remanded for a new trial, finding that the district court had erred by excluding evidence of Higgs's propensity to fall.  See Higgs v. Costa Crociere S.p.A., 720 F. App'x 518, 520 (11th Cir. 2017) (per curiam).

On remand, the discovery disputes came to a head.  Costa announced -- a little more than one month before the second trial -- that it intended to call a new corporate representative and expand the scope of his testimony to cover, among other things, "Costa's investigation following the subject incident" and "any other matter relating to Costa's knowledge or involvement with the facts alleged in the Complaint."  Higgs responded with a subpoena for "[a]ny and all internal correspondence concerning the incident in question or any efforts to investigate the incident" and "[a]ll documents regarding Costa's knowledge and/or investigation of the subject incident."  Costa refused to comply; thereafter, the district court granted Higgs's emergency motion to compel on August 30, 2018.  The court ordered Costa to produce responsive documents or a privilege log by September 7 in anticipation of the deposition of its new corporate representative on September

10. Costa produced the accident investigation report -- revealing Kamble's identity -- but did not produce Kamble's photos until September 11, 2018, one day after its corporate representative's deposition.

Incensed, Higgs filed a motion for discovery sanctions, seeking an adverse jury instruction regarding Kamble's identity and her photos. Costa moved in limine to preclude Higgs from raising discovery issues before the jury. The district court granted Higgs's sanctions motion and denied Costa's motion in limine. It found that Costa had committed "an egregious discovery violation" and adopted an adverse instruction that would permit but not require the jury to infer that earlier production of the photos and Kamble's identity would have been unfavorable to Costa. The adverse instruction read this way:

> You are instructed that the Court has found that the Defendant deliberately concealed from the Plaintiff the name of a witness with direct knowledge and participation in the investigation of this matter, Kavita Kamble. You are also instructed that the Defendant deliberately concealed from the Plaintiff photographs of the scene which were taken within 30 days of the incident, in violation of this Court's order.
>
> You may infer that Kavita Kamble would have offered testimony favorable to the Plaintiff had she been produced. You may also infer that the timely production of the photographs . . . would have been unfavorable to Defendant.

Before the trial started, the district court allowed Costa's counsel to voir dire the jury to ensure that the court's adverse instruction would not unduly prejudice Costa.

7

At trial, Higgs's counsel argued at length that Costa's concealment of evidence suggested its consciousness of guilt.  Costa did not object.  Before the case was submitted to the jury, Costa moved for judgment as a matter of law on the ground that Higgs hadn't shown that it had notice of the hazard posed by the bucket.  The motion was denied.

The jury returned a verdict for Higgs, awarding $650,000 in past general damages, $500,000 in future general damages, and $61,000 in past medical expenses, all to be discounted by 10% due to Higgs's comparative negligence.  The award for past medical expenses roughly matched the amount billed by Higgs's healthcare providers.  After briefing, however, the district court reduced the jury's award of medical expenses to $16,326.01, the amount it had determined was actually paid by Higgs and her insurer, United Healthcare, pursuant to United Healthcare's contractual discounts with the providers.  The total award amounted to $1,143,061.34, including pre-judgment interest.

Thereafter, Costa renewed its motion for judgment as a matter of law.  The district court denied the motion, finding ample evidence from which the jury could have concluded that Costa had notice of the hazard and that its adverse instruction was supported by both Federal Rule of Civil Procedure 37 and its own inherent power because of Costa's bad-faith pattern of discovery violations.  This timely appeal followed.

8

II.

Costa raises two challenges to the verdict. First, it argues that the district court erred in denying its motion for judgment as a matter of law because Higgs failed to produce evidence establishing that Costa was on notice of the hazard posed by the bucket, as required by maritime tort law. Second, Costa says it is entitled to a new trial because the district court's rulings on the discovery issues made the trial unfair. Specifically, it claims that the court abused its discretion by reading the adverse instruction to the jury. It also asserts that the district court should not have permitted Higgs's counsel to argue that Costa's alleged concealment of evidence suggested that it was liable for the fall.

A.

We review de novo a district court's denial of a motion for judgment as a matter of law. See Doe v. Celebrity Cruises, Inc., 394 F.3d 891, 902 (11th Cir. 2004). Judgment as a matter of law is appropriate when "the plaintiff presents no legally sufficient evidentiary basis for a reasonable jury to find for him on a material element of his cause of action." Pickett v. Tyson Fresh Meats, Inc., 420 F.3d 1272, 1278 (11th Cir. 2005). In entertaining a motion for judgment as a matter of law, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).

9

Higgs fell on a ship in navigable waters, so maritime law governs her lawsuit. Kornberg v. Carnival Cruise Lines, Inc., 741 F.2d 1332, 1334 (11th Cir. 1984). Maritime law is "a species of judge-made federal common law," Yamaha Motor Corp., U.S.A. v. Calhoun, 516 U.S. 199, 206 (1996), under which the owner and operator of a ship owes certain duties to the ship's passengers, the breach of which is a "maritime tort," Kornberg, 741 F.2d at 1334 (quotation omitted). "A carrier by sea, however, is not liable to passengers as an insurer, but only for its negligence." Id. A shipowner's duty in this regard is limited to "exercising reasonable care towards those lawfully aboard the vessel who are not members of the crew." Chaparro v. Carnival Corp., 693 F.3d 1333, 1336 (11th Cir. 2012) (per curiam) (emphasis and quotation omitted).

As we have explained, reasonable care "requires, as a prerequisite to imposing liability, that the carrier have had actual or constructive notice of the risk-creating condition." Keefe v. Bahama Cruise Line, Inc., 867 F.2d 1318, 1322 (11th Cir. 1989) (per curiam). To show notice, it is not enough to demonstrate merely that the defendant negligently created or maintained its premises. See Everett v. Carnival Cruise Lines, 912 F.2d 1355, 1358–59 (11th Cir. 1990). Rather, the plaintiff must establish that a cruise line in fact knew or should have known that a particular hazard existed. Id. Costa argues that Higgs has not done so.

10

We disagree.  Higgs introduced sufficient evidence from which the jury could reasonably infer that Costa, through its employees, had actual knowledge of the danger.  The evidence showed that a Costa employee placed a bucket -- more than one foot tall and filled with dirty water -- behind a blind corner in a highly-trafficked breakfast buffet pathway.  That this placement would pose a danger of tripping would have been obvious to anyone, including to any employee who knowingly placed the bucket there.  Moreover, the evidence was sufficient to allow the jury to infer that Costa was generally aware of the tripping hazard buckets can pose.  At least one Costa employee must have actually known both where the bucket had been placed and that it posed a substantial danger in that location.  This evidence is more than enough to establish Costa's actual notice of the hazard.

Higgs's daughter, Christina -- the only eyewitness to testify at trial -- stated that she saw her mother trip over a bucket placed "about 6 inches" around a corner and "about two" of her mother's small steps onto a carpeted area.  She further testified that, when she had been in the dining room previously, she noticed Costa employees using buckets to clean the tables and never saw anyone other than Costa employees handling them.  Domingo Jr. testified to the same effect.  He said that he saw Costa keep buckets "in the areas where people walk through."  He also testified that Costa was generally aware of the tripping danger buckets could pose, as there were "yellow caution signs" near some of the buckets in the dining room.

11

Finally, Higgs herself reported to the jury that after taking two steps around the corner she "knew [her] leg and foot had hit something because [she] started falling forward." She agreed with Christina that the bucket was "within 6 inches" of the corner and that she hadn't seen the bucket because she "was looking straight ahead." From these facts, the jury could reasonably infer that Costa had actual knowledge of the tripping hazard posed by the placement of the bucket on the carpeted pathway.

Moreover, even if this testimony was not sufficient to demonstrate actual knowledge, there was ample evidence from which the jury could have concluded that Costa had constructive knowledge (that is, it reasonably should have known) of the danger. Higgs's expert testified that the industry standard is to keep buckets "behind the scenes" because the "biggest concern" is "slip and falls." He further testified that none of the other major cruise companies permitted buckets to be placed in the dining area. Indeed, the testimony of Costa's corporate representative at the first trial, which was read to the jury the second time, conceded this point. The testimony made clear that Costa trained its employees to tuck buckets to busboy stations and that company policy prohibits placing the buckets in carpeted areas. Costa's corporate representative in the second trial disagreed, claiming "there are no rules that say[] where to place the buckets," but

even he admitted that buckets have to be placed "in a visible place and away from escape routes or emergency exits."

On this record, we are satisfied that a reasonable jury could find that Costa had actual or constructive notice that the bucket had been placed in the carpeted pathway, and actual or constructive notice of the danger presented. The district court did not err in denying Costa's motion for judgment as a matter of law.

B.

We review a district court's imposition of a discovery sanction, such as the district court's adverse jury instruction, for abuse of discretion, whether the sanction was imposed pursuant to Federal Rule of Civil Procedure 37 or the court's inherent power. See Amlong & Amlong, P.A. v. Denny's, Inc., 500 F.3d 1230, 1237 (11th Cir. 2007) (inherent power); Serra Chevrolet, Inc. v. Gen. Motors Corp., 446 F.3d 1137, 1146–47 (11th Cir. 2006) (Rule 37). Thus, we can only reverse discovery sanctions and grant a new trial if the court "made a clear error of judgment" or "applied the wrong legal standard." Amlong & Amlong, 500 F.3d at 1238 (quotation omitted). Costa argues that the district court committed a clear error of judgment by misinterpreting its good-faith efforts to comply with its discovery obligations. Again, we are unpersuaded.

Federal Rule of Civil Procedure 37(b) empowers a district court to issue sanctions, including providing a jury with adverse instructions, if a party "fails to

13

obey an order or to provide or permit discovery." See Fed. R. Civ. P. 37(b)(2)(A). Moreover, the trial courts of the United States have the inherent authority to issue sanctions as a punishment for bad-faith behavior in the proceedings before them. See Chambers v. NASCO, Inc., 501 U.S. 32, 50 (1991). Unlike sanctions short of dismissal under Rule 37, which do not require a finding of bad faith, see BankAtlantic v. Blythe Eastman Paine Webber, Inc., 12 F.3d 1045, 1049 (11th Cir. 1994), the "key to unlocking a court's inherent power is a finding of bad faith," Purchasing Power, LLC v. Bluestem Brands, Inc., 851 F.3d 1218, 1223 (11th Cir. 2017). "The standard is a subjective standard with a narrow exception for conduct tantamount to bad faith." Id.

The district court found that Costa had engaged in a bad-faith pattern of discovery violations designed to conceal important evidence from Higgs. It based this finding on three incidents: (1) Costa's omission of Kavita Kamble's identity in its initial disclosures; (2) its non-compliance with the magistrate judge's order mandating the production of "copies of those photographs which were taken on December 24, 2014 and December 25, 2014, and which depict the scene of the incident as it existed on December 24, 2014"; and (3) its non-compliance with the district court's August 30, 2018 order requiring production of all documents related to Costa's investigation of the incident. The district court reasonably

concluded that Costa had acted in bad faith, and it granted Higgs a reasonable remedy.

The most serious violation was Costa's concealment of the identity of Kavita Kamble. Indeed, because Costa concealed her identity throughout the first trial and disclosed it only two weeks before the second, Higgs has never had the opportunity to depose her, and we still do not know what she might have said. As the Costa employee who conducted the company's initial investigation of the incident, Kamble's identity should have been revealed in the company's initial disclosures. Federal Rule of Civil Procedure 26 requires a party, "without awaiting a discovery request," to disclose the identity "of each individual likely to have discoverable information" that "the disclosing party may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(i).[1] Moreover, a party must supplement

---

[1] That provision provides:

> Except as exempted by Rule 26(a)(1)(B) or as otherwise stipulated or ordered by the court, a party must, without awaiting a discovery request, provide to the other parties . . . the name and, if known, the address and telephone number of each individual likely to have discoverable information -- along with the subjects of that information -- that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.

Fed. R. Civ. P. 26(a)(1)(A)(i). Further, the Rules provide:

> A party who has made a disclosure under Rule 26(a) -- or who has responded to an interrogatory, request for production, or request for admission -- must supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or

that disclosure "in a timely manner if the party learns that in some material respect the disclosure" is "incomplete or incorrect." Fed. R. Civ. P. 26(e)(1)(A).

Kamble was obviously "likely to have discoverable information," but Costa claims it never intended to "use" it because it was not planning to call Kamble to testify at trial. This exceedingly narrow understanding of its disclosure obligations is at war with the spirit of openness and fair play the discovery rules embrace. See, e.g., United States v. Procter & Gamble Co., 356 U.S. 677, 682 (1958) (the purpose of the broad discovery rules is to "make a trial less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent"). Rule 26 of the Federal Rules of Civil Procedure makes it abundantly clear that a party's discovery obligations extend far beyond disclosure of the identities of witnesses it intends to call at trial. See Fed. R. Civ. P. 26(a)(1) advisory committee's note to 2000 amendment ("'Use' includes any use at a pretrial conference, to support a motion, or at trial. The disclosure obligation is also triggered by intended use in discovery, apart from use to respond to a discovery request . . . .").

---

corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or . . . as ordered by the court.

Fed. R. Civ. P. 26(e)(1).

16

Moreover, at a minimum, Kamble's identity should have been disclosed pursuant to Rule 26(a) and (e) as soon as Costa announced that its corporate representative's testimony would cover "Costa's investigation following the subject incident" in August 2018. At that point, Costa announced its intent to use information it could only have received from Kamble. Yet it still only disclosed her identity in response to a court order, weeks later.

The two other discovery violations concerned Costa's refusal to turn over the photographs taken by Kamble. In February 2016, the magistrate judge ordered Costa to turn over "copies of those photographs which were taken on December 24, 2014 and December 25, 2014, and which depict the scene of the incident as it existed on December 24, 2014." Costa turned nothing over, claiming that it had no responsive photos after Kamble executed an affidavit, which it also did not reveal, to the effect that the only photos she took did not depict the scene at the moment Higgs fell. Years later and only a few weeks before the second trial, the district court ordered Costa to produce "[a]ll documents regarding Costa's knowledge and/or investigation of the subject incident," or a privilege log. Costa still did not specifically acknowledge the existence of the photographs until after the deadline set by the court, and after the deposition of its corporate representative.

Costa argues that it did not deliberately avoid disclosing the photographs. It says the magistrate judge's order did not cover the photographs, since they did not

17

depict the scene of the incident "as it existed on December 24, 2014." This argument is too clever by half. For starters, Costa's much-too-literal interpretation of the magistrate judge's order is incorrect. That order contemplated production of photographs taken on "December 24, 2014 and December 25, 2014." A photograph taken on December 25 cannot literally depict the scene as it existed on December 24. The court's order is better understood as capturing photographs which roughly depict, or were intended to depict, the scene as it existed when Higgs tripped. Kamble's photographs fit that bill perfectly. That Kamble swears in her affidavit that the photographs do not depict the scene "at the moment the guest fell" -- language which appears nowhere in the magistrate judge's order -- is of little moment. Under Costa's interpretation, it would have been required to disclose only those photographs coincidentally taken just at the moment Higgs fell to the ground. That could not possibly be what the judge's order meant.

Moreover, if Costa genuinely believed in good faith that the photographs it had did not fall within the order it could and should have said so before now. It could have explained to the magistrate court or, for that matter, to the district court why it believed its photos were not responsive. It could have produced Kamble's affidavit, or it could have offered to produce the photos in camera. It did none of these things. It simply denied that it had any responsive photos. This is not the behavior of a party acting in good faith.

18

Finally, the sanction the district court chose to apply -- a permissive adverse-inference instruction -- was among the most restrained in its arsenal. The district court also permitted Costa's counsel to voir dire the jurors to ensure they understood the instruction. The court instructed the jury that it had found that Costa violated court orders related to discovery and that the jury could, but was not required to infer that earlier disclosure of the information would have been unfavorable to Costa. But the district court could have gone further still: it could have "direct[ed] that the matters . . . be taken as established for purposes of the action" or it could even have "prohibit[ed] the disobedient party from supporting or opposing designated claims or defenses." Fed. R. Civ. P. 37(b)(2)(A)(i), (ii). In short, the district court did not abuse its considerable discretion in sanctioning Costa's conduct with a permissive adverse-inference instruction. Because the instruction was not an abuse of discretion, a new trial is not warranted on this basis.

## C.

Next, Costa urges us to grant a new trial because the statements made by Higgs's counsel accusing Costa of concealing evidence unduly prejudiced it and encouraged the jury to resolve the case on an impermissible basis. Higgs's counsel, indeed, made much of Costa's pre-trial litigation conduct and the district court's adverse-inference instruction during his opening statement and closing

19

argument. Counsel argued that "concealment" was a theme in the case; that Costa "concealed for years photographs of the scene of the accident which would have showed us [the bucket was] exactly where Mrs. Higgs said it was"; and that Costa "intended to hide evidence" and "violate Court orders" as "part of a scheme and a plan to prejudice this case," as found by "the man in the black robe, nominated by the President of the United States and appointed by the United States Senate to sit as a federal district court judge."

But Costa did not object to any of those statements when they were made, and so our review is only for plain error.[2] See United States v. Pielago, 135 F.3d 703, 707 (11th Cir. 1998). "Under the plain error standard, before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. Smith, 459 F.3d 1276, 1283 (11th Cir. 2006) (quotation omitted). Because the interests at stake are less acute than in the

---

[2] Costa argues our review should be for abuse of discretion, since the district court's order denying Costa's motion in limine implicitly authorized counsel's statements. See Kropilak v. 21st Century Ins. Co., 806 F.3d 1062, 1067 (11th Cir. 2015). We disagree. It is well established that "'the overruling of a motion in limine does not suffice' for preservation of an objection on appeal." United States v. Brown, 665 F.3d 1239, 1247 (11th Cir. 2011) (per curiam) (quoting United States v. Khoury, 901 F.2d 948, 966 (11th Cir. 1990)). And where a party fails to renew its objection at trial, our review is only for plain error. Id.

criminal context, "a finding of plain error is seldom justified in reviewing argument of counsel in a civil case." Oxford Furniture Cos. v. Drexel Heritage Furnishings, Inc., 984 F.2d 1118, 1128 (11th Cir. 1993) (quotation omitted). To warrant reversal, an impermissible argument must "gravely" impair the "calm and dispassionate consideration of the case by the jury." BankAtlantic, 955 F.2d at 1474 (quotation omitted).

Those conditions are not met here. The statements to which Costa now objects -- suggesting that it still had not turned over all of its photographs, that it failed to disclose the identity of Kamble because it knew her testimony would be unfavorable, and that Kamble knew the identities of eyewitnesses -- all had a basis in evidence. That means they cannot clear the high bar required to demonstrate plain error in a civil case. See Oxford Furniture, 984 F.2d at 1129 (finding no plain error even where counsel in closing arguments made statements "for which there was no supporting evidence, outright misstatements of the evidence, [and] expressions of counsel's personal opinions"). Moreover, the district court repeatedly instructed the jury that statements by counsel are not evidence. Cf. United States v. Lopez, 590 F.3d 1238, 1256 (11th Cir. 2009) (explaining that, where the district court instructs the jury that counsel's statements are not evidence, "we will reverse only if the [statement] is so prejudicial as to be incurable"). Finally, Costa contemporaneously objected on other grounds to some

21

of the statements it now claims were prejudicial, and the district court sustained those objections.  Thus, even if permitting these statements was error at all, it was not plain, nor did it affect the fairness, integrity, or public reputation of the court.

### III.

Finally, we come to the matter of damages.  In her cross-appeal, Higgs raises an important issue of first impression for this Court -- how to calculate past medical expense damages in a maritime tort action where, as has become common, there is a dramatic disparity between the amount a healthcare provider bills a plaintiff for treatment and the amount her insurer actually pays the provider in satisfaction.  This question has divided district courts in the Southern District of Florida.  Compare Bonnell v. Carnival Corp., No. 13-CV-22265, 2015 WL 12712609, at *3 (S.D. Fla. Jan. 20, 2015) (granting motion in limine to exclude evidence of the amount actually paid), with Gharfeh v. Carnival Corp., No. 17-20499-CIV, 2019 WL 186864, at *6 (S.D. Fla. Jan. 14, 2019) (fixing the plaintiff's recovery at the amount actually paid as a matter of law).

Today, we adopt the rule that best reflects the idiosyncratic realities of the healthcare market, avoids reliance on arbitrary factors unrelated to the harm suffered by the plaintiff, and affirms our confidence in juries to resolve challenging questions of fact.  We hold that the appropriate measure of medical damages is a reasonable value determined by the jury upon consideration of all relevant

22

evidence.  Both the amount <u>billed</u> by healthcare providers and the amount <u>paid</u> by insurers are admissible as relevant to the question of fixing reasonable value.  Because the district court erroneously reduced the jury's award of medical damages to Higgs under a <u>per se</u> rule that would cap the amount of damages at the amount paid, we reverse.

### A.

After her injury at sea, Joyce Higgs was in and out of the offices of doctors and physical therapists for years.  Based on the bills introduced into evidence, these healthcare providers billed her, in total, $60,944.11.  But Higgs was responsible for making only her copayment -- a small fraction of this amount.  She has a Medicare Advantage plan with United Healthcare, paid for by her pension from the public schools of Georgia, for which premiums are deducted from her retirement pay.  United Healthcare overwhelmingly bore the costs of Higgs's treatment.  But it didn't pay the $60,944.11 total either -- no one did.  According to the billing statements offered to the jury, Higgs paid $350 in copays.  The bills reflect an outstanding balance of $2,794.70.  United Healthcare was responsible for the remaining $57,799.41.  But it didn't even pay that amount.  Instead, pursuant to the generally applicable contract United Healthcare has with Higgs's medical

providers, the bills reflect that it paid only $12,313.67 in total in satisfaction of the charges, and the healthcare providers "wrote off" the remaining $45,485.74.[3]

This fact pattern -- in which a medical provider ostensibly bills a certain amount to an insurer, but a preexisting contract between the two requires only a fraction of that amount to be paid -- has become very common in the healthcare market.  Many insurers have longstanding contracts with healthcare providers to settle bills at steep discounts from the amounts nominally charged for the treatment of insureds.  This can result in, as here, a dramatic disparity between the amount billed and the amount paid for a plaintiff's medical treatment.  Because this market structure may obscure the real value of medical services, courts have struggled to square tort law with the realities of modern healthcare finance.

In this case, the district court permitted Higgs to introduce into evidence unredacted billing records from her healthcare providers.  Those records depict the total amount billed, the smaller amount paid by United Healthcare, and the amount written off.  Accompanying these records were attestations that the amounts billed

---

[3] These figures are based on the medical records that were admitted into evidence and considered by the jury in the second trial.  The record indicates, however, that these were not the only medical bills Higgs in fact received and which were produced in discovery.  In calculating the total amount paid by Higgs and her insurer, for the purpose of reducing her recovery to that amount, the district court relied on all the bills produced in discovery, not only those that were offered to the jury.  Had the district court considered only the bills presented to the jury during the second trial, the corresponding figure would have been $15,458.37, not $16,326.01.  Because we hold that it was error for the district court to reduce Higgs's recovery at all, we need not consider whether it reduced the recovery in an appropriate way.

"represent the necessary and reasonable expenses for the services provided to Joyce Higgs."  After the close of evidence, the district court charged the jury to find the "reasonable value or expense of medical care and treatment necessarily or reasonably obtained by Mrs. Higgs in the past."[4]  Based on its review of all of the evidence extant, the jury determined that the reasonable value of past medical expenses was $61,000.

After the verdict, however, Costa persuaded the district court to reduce the jury's award to the amount actually paid by Higgs and United Healthcare -- approximately $16,000 -- on the theory that a plaintiff's recovery, as a matter of law, is limited to the amount paid for her medical treatment.  Many district courts in the Southern District of Florida have adopted this rule in maritime tort cases. See, e.g., Gharfeh, 2019 WL 186864, at *6 (joining "myriad Southern District of Florida cases (most of them within the past three years)" and holding that "a plaintiff would obtain an improper windfall if he or she were permitted to recover damages for the billed-but-not-paid amount or to recover for bills that were written

---

[4] The district court's instruction read this way:

> You shall consider the . . . . reasonable value or expense of medical care and treatment necessarily or reasonably obtained by Mrs. Higgs in the past.

> You should not reduce the amount of compensation for past medical care to which Mrs. Higgs is otherwise entitled, on account of any payments made by health insurance, or by Medicare, or by any other source.

off" (emphasis in original)); <u>Diczok v. Celebrity Cruises, Inc.</u>, No. 16-21011-CIV, 2017 WL 3206327, at *3 (S.D. Fla. July 26, 2017); <u>Smith v. Royal Caribbean Cruises, Ltd.</u>, No. 13-20697-Civ., 2014 WL 5312534, at *3 (S.D. Fla. Oct. 10, 2014).

Other district courts, however, have adopted the opposite rule -- either fixing a plaintiff's recovery at the amount billed or excluding evidence of the amount paid. <u>See</u> <u>Milbrath v. NCL Bah., Ltd.</u>, No. 1:17-cv-22071, 2018 WL 2036081, at *5 (S.D. Fla. Feb. 28, 2018) ("A tortfeasor should not be able to escape its compensation duty through a reduction in its liability payment by a plaintiff who happens to have his or her medical expenses written off; this would reduce the deterrent effect of damages on the tortfeasor."); <u>Bonnell</u>, 2015 WL 12712609, at *3; <u>Jones v. Carnival Corp.</u>, No. 04-20407-CIV, 2006 WL 8209625, at *2 (S.D. Fla. Jan. 24, 2006).

The controversy surrounding this damages question is limited neither to the Southern District of Florida nor to maritime law -- courts around the country have struggled to calculate medical damages in tort cases when medical bills overstate expenses. <u>See, e.g.</u>, <u>Deperrodil v. Bozovic Marine, Inc.</u>, 842 F.3d 352, 360 (5th Cir. 2016) ("State laws differ as to their approach to written-off expenses in tort cases; within our circuit alone, three different rules prevail."); <u>see also</u> Jacob A. Stein, 2 Stein on Personal Injury Damages Treatise § 7:36 (3d ed.) (noting that

26

"there is no consensus on the appropriate rule among the few courts that have reached the question").

B.

The resolution of this question turns on the construction of a principle of tort law known as the collateral source rule. The collateral source rule is both a substantive principle of damages and an evidentiary rule. In its substantive role, the collateral source rule provides that a plaintiff is entitled to recover the full value of the damages caused by a tortfeasor, without offset for any amounts received in compensation for the injury from a third party (like an insurance company or a family member). See Bourque v. Diamond M. Drilling Co., 623 F.2d 351, 354 (5th Cir. 1980);[5] Restatement (Second) of Torts § 920A(2) ("Payments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable."). In its evidentiary role, the collateral source rule bars the admission of evidence of payments made by third parties. Bourque, 623 F.2d at 354 ("[T]he rule prohibits the introduction of evidence offered to show that [a plaintiff] already has been compensated for his injuries.").

---

[5] In Bonner v. City of Prichard, we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

The collateral source rule is thus an exception to the basic tort principle that damages are designed to make the plaintiff whole -- the rule allows a plaintiff to recover damages for a harm for which she has already been compensated.  In fact, it makes her more than whole.  25 C.J.S. Damages § 189 ("The collateral-source rule is an exception to the general rule of damages preventing a double recovery by an injured party, or in other words, it is an exception to the general rule that in a tort action, the measure of damages is that that will compensate and make the plaintiff whole.").  But the law conceptualizes the collateral source payment as necessarily a windfall -- after all, a party other than the victim or the alleged tortfeasor has voluntarily chosen to bear the costs of the victim's injury -- that is better awarded to the plaintiff than the tortfeasor.  See Sweep v. Lear Jet Corp., 412 F.2d 457, 459 (5th Cir. 1969) (summarizing justifications for the collateral source rule).  Moreover, the rule is understood to avoid discouraging plaintiffs from prudently paying for insurance by limiting their recoveries, and it deters negligence by punishing tortfeasors for the full amount of their wrongdoing.  Id.

It is also well established that the collateral source rule -- both in its substantive and evidentiary roles -- applies to maritime tort cases.  See Bourque, 623 F.2d at 352, 354.  Its proper application to contemporary medical expenses is a vexing question, however.  See McConnell v. Wal-Mart Stores, Inc., 995 F. Supp. 2d 1164, 1169 (D. Nev. 2014) ("As controversial as the collateral source rule is,

28

whether the rule should apply to 'write-downs' is even more so."). It is uncontested that as a substantive, general matter, the collateral source rule applies to the calculation of Higgs's medical damages. That is, Higgs is entitled to recover medical damages over and above the amount she paid out of pocket, even though those costs were settled by her insurer. Both parties agree -- as they must -- that Higgs is entitled to recover some amount for which United Healthcare was solely responsible. Thus, in some real way, she is <u>going</u> to receive a windfall. The question before us is how much, and how that figure should be calculated.

1.

Our guiding principle is that plaintiffs are entitled to recover the reasonable value of treatment for injuries they have sustained, regardless of whether their medical expenses have been paid and by whom. <u>See</u> Restatement (Second) of Torts § 924 ("One whose interests of personality have been tortiously invaded is entitled to recover damages for past . . . reasonable medical . . . expenses."); <u>see also</u> <u>Harrison v. Flota Mercante Grancolombiana, S.A.</u>, 577 F.2d 968, 977 (5th Cir. 1978) (recognizing that "[g]eneral maritime law incorporates the general law of torts when not inconsistent with the law of admiralty"); <u>Gorman v. Miller</u>, 415 F.2d 1137, 1138 (5th Cir. 1969) (per curiam) (affirming award of "usual, reasonable and customary" medical expenses to plaintiff); Restatement (Second) of Torts § 911 cmt. h ("When the plaintiff seeks to recover for expenditures made or

29

liability incurred to third persons for services rendered, normally the amount recovered is the reasonable value of the services rather than the amount paid or charged."); id. § 924 cmt. f ("The value of medical services made necessary by the tort can ordinarily be recovered although they have created no liability or expense to the injured person . . . .").

Because of the way in which healthcare is paid for in the United States, we simply cannot say that the amount healthcare providers charge categorically reflects that reasonable value.  As the Supreme Judicial Court of Massachusetts has explained:

> With the increasing role played by public and private health insurers in the American health care delivery system, doctors, hospitals, and other medical care providers have developed charge structures that may have little or no relationship to the reasonable value of the medical services at issue, because the providers ultimately negotiate discounts from the listed charges and are reimbursed on the basis of the discounted rates.  The only patients actually paying the stated charges are the uninsured, a small fraction of the medical bill payors.

Law v. Griffith, 930 N.E.2d 126, 133 (Mass. 2010); see also Mark A. Hall & Carl E. Schneider, Patients as Consumers: Courts, Contracts, and the New Medical Marketplace, 106 Mich. L. Rev. 643, 663 (2008) (noting that, over the past decade "markups over costs have more than doubled, from 74% to 164%"); James McGrath, Overcharging the Uninsured in Hospitals: Shifting a Greater Share of Uncompensated Medical Care Costs to the Federal Government, 26 Quinnipiac L.

Rev. 173, 185 (2007) (observing that the "nation's health care payment systems" have "evolved into a system where a hospital's list price is relatively meaningless"); George A. Nation III, Hospitals Use the Pernicious Chargemaster Pricing System to Take Advantage of Accident Victims: Stopping Abusive Hospital Billing, 66 Drake L. Rev. 645, 652–53 (2018) (noting that healthcare prices "are not set by the hospital to be paid; rather, they are set to be discounted in negotiations with insurance companies and to game the . . . system"). Indeed, many courts around the country in recent years have taken notice of the extent to which medical bills can overestimate the reasonable value of medical services.[6] Thus, categorically adopting the amount billed as the measure of recovery would routinely give plaintiffs unreasonably large damages awards, unjustifiable in law or fact.

---

[6] See, e.g., Weston v. AKHappytime, LLC, 445 P.3d 1015, 1030–31 (Alaska 2019) (Stowers, C.J., dissenting) ("[T]here is nothing reasonable about the intentionally inflated and knowingly fictitious prices charged by the healthcare providers . . . . The amount originally billed by the healthcare providers has no rational relationship to the economic realities of modern healthcare payment practices."); Kenney v. Liston, 760 S.E.2d 434, 451 (W. Va. 2014) (Loughry, J., dissenting) ("Given the current complexities of health care pricing structures, it is simply absurd to conclude that the amount billed for a certain procedure reflects the 'reasonable value' of that medical service."); Howell v. Hamilton Meats & Provisions, Inc., 257 P.3d 1130, 1142 (Cal. 2011) ("[M]aking any broad generalization about the relationship between the value or cost of medical services and the amounts providers bill for them -- other than that the relationship is not always a close one -- would be perilous."); Martinez v. Milburn Enters., Inc., 233 P.3d 205, 223 (Kan. 2010) (identifying the "present tenuous relationship between medical charges and medical costs"); Leitinger v. DBart, Inc., 736 N.W.2d 1, 24 (Wis. 2007) (Roggensack, J., dissenting) ("It has been said that the amount billed for medical expenses has become a fictitious amount.").

On the other hand, neither could we say that the amount paid -- an amount established by broad contracts between insurers and providers, divorced from the treatment of a particular plaintiff -- is categorically a better approximation of the reasonable value of a provider's medical services. See, e.g., Stayton v. Del. Health Corp., 117 A.3d 521, 532 (Del. 2015) ("Just as the amounts healthcare providers charge today are not, in any realistic sense, standard or going rates, neither are the amounts paid by particular payers."). Indeed, the amount paid for a plaintiff's treatment varies widely based often on factors entirely unrelated to the services provided, including the relationship between a particular insurer and a particular provider or whether the plaintiff is insured at all. See, e.g., Law, 930 N.E.2d at 134 (explaining that "the discount from charges that the provider accepts is likely a function of a variety of factors, including the bargaining power of the insurer or, as here, limited by Federal or State law -- factors that relate to the injured plaintiff's relationship with a collateral third-party payor and have nothing to do with the tortfeasor").

Many courts have likewise observed the extent to which the amount paid in a particular case is a function of unrelated and largely arbitrary factors.[7] Indeed,

---

[7] See, e.g., Weston, 445 P.3d at 1025 (describing "the inherent weakness in relying on the amounts paid as presumptive proof of reasonableness"); Tri-County Equip. & Leasing, LLC v. Klinke, 286 P.3d 593, 597 n.6 (Nev. 2012) ("[I]t is apparent that there are numerous reasons for medical provider discounts, including discounts that result when an injured party's insurance company has secured medical provider discounts as part of the health insurance plan."); Howell, 257 P.3d at 1144 ("For a given medical service to a given plaintiff . . . the amount of the

32

fixing a plaintiff's recovery at the amount paid injects arbitrary variation into the recoveries of similarly situated plaintiffs based on the happenstance of their insurance -- precisely the result the collateral source rule, which is based on the premise that plaintiffs who suffer the same injuries should receive the same recovery, is designed to prevent.  Cf. Sweep, 412 F.2d at 459 ("The fact that an injured person receives from a collateral source payments which may have some tendency to mitigate the consequences of the injury which he otherwise would have suffered may not be taken into consideration in assessing the damages or other recovery to which the claimant may be entitled.").  Moreover, fixing recovery rigorously on the amount actually paid would harm insureds of larger insurance plans as opposed to the uninsured and would particularly limit the recoveries of poor and elderly people covered by Medicaid and Medicare.  See Stayton, 117 A.3d at 532 ("Given the particularly hard bargain that government drives with providers, poor and disabled persons covered by government programs will receive the lowest recovery in litigation.").  Thus, we cannot say as a matter of

---

negotiated rate differential may be higher or lower than the average discount over the range of services offered."); Stanley v. Walker, 906 N.E.2d 852, 857 (Ind. 2009) ("Thus, based on the realities of health care finance, we are unconvinced that the reasonable value of medical services is necessarily represented by either the amount actually paid or the amount stated in the original medical bill."); Leitinger, 736 N.W.2d at 18 ("The reimbursement rate of a particular health insurance company generally arises out of a contractual relationship and reflects a multitude of factors related to the relationship of the insurance company and the provider . . . ."); Radvany v. Davis, 551 S.E.2d 347, 348 (Va. 2001) ("[N]egotiated amounts . . . do not reflect the 'prevailing cost' of [medical] services to other patients.").

law that the amount paid is any more likely to reflect reasonable value than the amount billed.

The long and the short of it is that, as the Indiana Supreme Court has observed, the "complexities of health care pricing structures make it difficult to determine whether the amount paid, the amount billed, or an amount in between represents the reasonable value of medical services." Stanley v. Walker, 906 N.E.2d 852, 857 (Ind. 2009). In this environment, as we see it, it would be inappropriate to impose a bright-line rule for the calculation of damages. Rather, in the absence of any legislation clarifying this measure of damage, it is wiser to leave the ultimate determination -- the reasonable value of medical services received by a particular plaintiff in a particular case -- to the jury, upon its consideration of all relevant evidence, notably including the amount billed, the amount paid, and any expert testimony and other relevant evidence the parties may offer.[8]

The supreme courts of several states have generally adopted this approach to the calculation of medical expenses in tort cases. See id.; see also Martinez v. Milburn Enters., Inc., 233 P.3d 205, 222–23 (Kan. 2010); Robinson v. Bates, 857

---

[8] We note that some state legislatures have modified the scope of the collateral source rule by statute. See, e.g., Jones v. Carnival Corp., No. 04-20407-CIV, 2006 WL 8209625, at *2 (S.D. Fla. Jan. 24, 2006) (noting that "Fla. Stat. § 768.76 . . . abrogates the common law collateral source rule"). No such legislation bears upon the determination of this question in maritime tort law.

N.E.2d 1195, 1200 (Ohio 2006); Haselden v. Davis, 579 S.E.2d 293, 294–95 (S.C. 2003). Other jurisdictions have adopted a similar rule in which the jury is charged to determine the reasonable value of medical services and the defendant may "call a representative of the particular medical provider whose bill the defendant wishes to challenge, and to elicit evidence concerning the provider's stated charges and the range of payments that the provider accepts for the particular type or types of services the plaintiff received." See Law, 930 N.E.2d at 135–36; see also Howell v. Hamilton Meats & Provisions, Inc., 257 P.3d 1130, 1152 (Cal. 2011) (Klein, J., dissenting) ("[T]he reasonable value of the patient's care is a question for the trier of fact. It may be that the sum the providers accepted in full payment is equivalent to the reasonable value of the care, or it may be that the reasonable value of the care is a higher figure.").

## 2.

We begin again observing that the collateral source rule plays two roles: a substantive one, which prohibits the reduction of a plaintiff's damages by amounts paid by a third party; and an evidentiary one, which prohibits admission of evidence that a third-party payment was made in compensation of a plaintiff's injuries. See Bourque, 623 F.2d at 354. The evidentiary role of the collateral source doctrine acts as a prophylactic, shielding the jury from evidence that is likely to encourage it to violate the substantive role of the rule. See, e.g., Leitinger

35

v. DBart, Inc., 736 N.W.2d 1, 14 (Wis. 2007) (explaining that the evidentiary role of "the collateral source rule protects against the ever-present danger that the jury will misuse evidence of collateral payments to diminish the damage award" (alteration adopted and quotation omitted)).  The two principal arguments against the approach we adopt in this case arise from disagreements about the scope of the evidentiary role of the collateral source rule.

First, some jurisdictions conceptualize a healthcare write-off itself as a "collateral payment," evidence of which cannot be admitted under the collateral source rule.  Id.  Because introducing a lower amount for which the bills were settled necessarily indicates that some sort of discount was made, these courts hold that any evidence of the amount paid is categorically inadmissible, even if they also ostensibly charge the jury to find the reasonable value of the medical expenses.  See, e.g., Olariu v. Marrero, 549 S.E.2d 121, 123 (Ga. Ct. App. 2001) (noting that a prior Georgia case "establishes that a write-off of medical expenses is a collateral source of payment" that was properly excluded).

We do not find persuasive the argument that a contractual discount of medical expenses is properly considered as a payment for purposes of the collateral source rule.  To do so ignores the reality of the contemporary healthcare market.  It is, of course, true that in general a "discharge of a debt is a type of payment." Jones, 2006 WL 8209625, at *2.  But application of that economic truism in this

36

context makes little sense where the "debt" only ever exists on paper and no one -- not the insurer, not the provider, not the taxpayer, and not the plaintiff -- was ever responsible for paying it. In the healthcare market, because the written-off amount was established by preexisting contracts, the healthcare providers could not have collected the amount nominally billed from anyone, ever. See Suhor v. Lagasse, 770 So. 2d 422, 427 (La. Ct. App. 2000) (characterizing the amount billed as "a non-existent debt"); see also John Dewar Gleissner, Proving Medical Expenses: Time for a Change, 28 Am. J. Trial Advoc. 649, 656 (2005) (describing medical bills as presenting "an amount that never was and never will be paid"). Indeed, because such a large percentage of medical expenses are paid under contracts that provide for discounts, the contracts themselves play a role in setting billed medical expenses by encouraging providers to bill arbitrarily large amounts with the knowledge and expectation that no one will ever be required to pay so high a figure. See Kenney v. Liston, 760 S.E.2d 434, 451 (W. Va. 2014) (Loughry, J., dissenting) ("Like retailers who raise the price of their goods by twenty-five percent before having a ten percent off sale, medical providers utilize the same sort of tactic to ensure a profit."). In other words, because the amount billed does not create a debt in any meaningful sense, the write-off is not a reduction of debt in any meaningful sense, and it is not subject to the evidentiary bar of the collateral source rule.

Moreover, evidence of the amount paid is probative of the reasonable value of medical services in a way that evidence of other kinds of collateral payments is not. If a tortfeasor negligently destroys a car, the fact that the plaintiff's wealthy uncle bought her a replacement does not elucidate the reasonable value of the destroyed car in any way. Not so in the wild world of medical billing, where the jury needs all the help it can get -- if, for example, it is standard that bills for a particular medical procedure are settled at a steep discount, the amount billed is unlikely to approximate the reasonable value of the provider's medical services. Cf. id. at 451–52 ("What more probative evidence of the reasonable value of the services could there be than the negotiated and paid rate for the services?"); Scott v. Garfield, 912 N.E.2d 1000, 1014 (Mass. 2009) (Cordy, J., concurring) ("[T]he plaintiff is only entitled to the reasonable value of his medical expenses, and the price that a medical provider is prepared to accept for the medical services rendered is highly relevant to that determination."). The evidentiary role of the collateral source rule was never intended to shield the jury from highly probative evidence of this kind. See Joel K. Jacobsen, The Collateral Source Rule and the Role of the Jury, 70 Or. L. Rev. 523, 541 (1991) ("[C]oncealing relevant

information from the jury does not further the legitimate purpose of the collateral source rule.").[9]

Indeed, this conclusion -- that a write-off of medical expenses is not a collateral source payment -- appears to be the majority position among the district courts in the Southern District of Florida applying maritime law. See Gharfeh, 2019 WL 186864, at *6 ("Those cases, which now appear to generate the majority view in our district, hold that the collateral source rule in admiralty cases is not implicated by discounts or write-offs . . . ."). Though we disagree with the courts that cap a plaintiff's damages, as a matter of law, at the amount paid, we find their reasoning on the evidentiary question persuasive. See id. at *7 ("Moreover, prohibiting evidence of the discount or write-off gives the jury a skewed view of the financial reality surrounding the medical bills.").

The second criticism levied at the approach we adopt today is that introducing evidence of the amount paid necessarily injects the fact that the

_____

[9] For similar reasons, we are not persuaded by the argument -- made by some courts that conceive of a write-off as a collateral source payment -- that the collateral source rule always contemplates windfall and therefore that recovery of the entire amount billed is unobjectionable. See Acuar v. Letourneau, 531 S.E.2d 316, 323 (Va. 2000) ("To the extent that [our] result provides a windfall to the injured party, we have previously recognized that consequence and concluded that the victim of the wrong rather than the wrongdoer should receive the windfall."). This argument makes little sense. The collateral source rule necessarily contemplates some windfall, but it is agnostic as to how much. See Diczok v. Celebrity Cruises, Inc., No. 16-21011-CIV, 2017 WL 3206327, at *3 (S.D. Fla. July 26, 2017) ("[T]he collateral source doctrine does not govern the amount of medical expenses a plaintiff may claim in damages." (emphasis added)). That is, the rule ensures that a plaintiff may recover the full value of the damage caused by the tortfeasor, but it says nothing about the value of that damage.

plaintiff is insured into the trial, which encourages the jury to abandon the substantive aspect of the collateral source rule and award minimal medical expenses. See, e.g., Leitinger, 736 N.W.2d at 13 ("If evidence of the collateral source payments were admissible, even for consideration of the reasonable value of the medical treatment rendered, a plaintiff's recovery of medical expenses would be affected by the amount actually paid by a collateral source for medical services."). But to the extent a plaintiff worries she may be prejudiced by the jury's knowledge of the fact that she is insured, the district court may choose to admit into evidence only the total amount for which the medical bills were settled, without reference to who settled them.[10] See Stanley, 906 N.E.2d at 853 ("To the extent the discounted amounts may be introduced without referencing insurance, they may be used to determine the reasonable value of medical services."). In this way, admitting evidence of the paid amount -- which could have been paid by the plaintiff (indeed, part of it was), the insurer, or anyone else -- does not violate the letter or the spirit of the collateral source rule. It is simply a figure, described as the total actual amount of payment, that provides a benchmark for the jury's

---

[10] This did not happen here because Higgs had no objection to the introduction of her medical bills in unredacted form -- indeed, she offered the bills into evidence herself. Higgs's counsel conceded that he "couldn't really redact them without just complet[ely] butchering up the bills because the way it was, Medicare was referenced in there and her United Healthcare." The evidentiary role of the collateral source rule is designed to protect plaintiffs from prejudice, and we will not interfere with counsel's judgment that Higgs was unlikely to be prejudiced by acknowledgement of the fact that she was insured.

40

consideration of the reasonable value of a provider's medical services.  See Martinez, 233 P.3d at 226 ("[I]f the jury hears that '$5,000 has paid this $70,000 bill in full,' then the jury can still reasonably perceive that the plaintiff has paid it herself, e.g., by receiving a cash discount.").

And, in the event that the plaintiff does not object to the admission into evidence of the settling party's identity, we trust the jury to follow a court's specific instruction that it may not offset the calculation of medical damages by any amounts paid by third parties.  See, e.g., ML Healthcare Servs., LLC v. Publix Super Markets, Inc., 881 F.3d 1293, 1303 (11th Cir. 2018) (finding sufficient a court's jury instruction "not to reduce any damages it might award on account of" a third party's payments, since few "tenets are more fundamental to our jury system than the presumption that juries obey the court's instructions" (quotation omitted)); see also Marshall v. Lonberger, 459 U.S. 422, 438 n.6 (1983); Raulerson v. Wainwright, 753 F.2d 869, 876 (11th Cir. 1985) (per curiam).[11]

---

[11] In addition, we will not indulge the fiction that, in general, it would only be the introduction of evidence of the amount paid that could raise the specter of a plaintiff's health insurance in the jury's mind.  That specter is always there.  It is a matter of common knowledge that the overwhelming majority of Americans have some form of health insurance.  See Law, 930 N.E.2d at 133 (observing that the uninsured are a "small fraction" of patients); U.S. Census Bureau, Health Insurance Coverage in the United States: 2018 2 (2019) (stating that 91.5% of Americans had health insurance coverage for some or all of 2018); see also Martinez, 233 P.3d at 228 (noting that juries "likely infer insurance coverage for defendants and plaintiffs in cases involving motor vehicle accidents" but in such cases "we routinely entrust our juries with . . . determining . . . damage amounts" (quotation marks omitted)).

Our confidence in juries was vindicated by the events in this case. Because the evidence Higgs offered to prove her medical expenses also showed that most of those expenses were settled by United Healthcare, the district court instructed the jury that it "should not reduce the amount of compensation for past medical care to which Mrs. Higgs is otherwise entitled, on account of any payments made by health insurance, or by Medicare, or by any other source." We know that the jury followed this instruction because it awarded to Higgs the entire amount billed, without any offset for the portions settled by her insurer.

For these reasons, we hold that the appropriate measure of past medical expense damages in a maritime tort case is the amount determined to be reasonable by the jury upon its consideration of all relevant evidence, including the amount billed, the amount paid, and any expert testimony and other relevant evidence the parties may offer. We need not remand for further proceedings because the jury calculated its original damages award in a manner wholly consistent with this rule. In the trial court, Higgs introduced into evidence her unredacted medical bills, which itemized both the amount billed and the amount paid. The district court properly charged the jury to determine the reasonable value of the medical treatment Higgs received. The only evidence the jury heard as to the reasonableness of the charges were attestations accompanying the bills that the amounts billed "represent the necessary and reasonable expenses for the services

42

provided to Joyce Higgs." But Costa knew that it could introduce evidence of the unreasonableness of the billed amounts. Indeed, at the charge conference after the presentation of the evidence, Costa's counsel told the court it had chosen not to do so because Higgs had the burden of proving "the reasonableness of the bills," and Costa thought she had not met her burden. The jury disagreed, as it was plainly permitted to do.

Simply put, the jury arrived at its initial calculation of medical expenses consistent with the rule we adopt in this case. Only the district court's post-trial reduction of damages was error. Thus, we reverse the district court's reduction of the jury's damages award and remand with instructions for it to enter final judgment reinstating the amount of medical expenses found to be reasonable by the jury, discounted by 10% for Higgs's comparative negligence.

Accordingly, we **AFFIRM IN PART, VACATE IN PART** and **REMAND IN PART.**