**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 10, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

TINA GARCIA,

        Plaintiff-Appellant,

v.

BERKSHIRE LIFE INSURANCE
COMPANY OF AMERICA, a wholly
owned subsidiary of The Guardian
Life Insurance Company of America,
and THE GUARDIAN LIFE
INSURANCE COMPANY OF
AMERICA, a foreign insurance
company,

        Defendants-Appellees.

No. 08-1022

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 1:04-CV-01619-LTB-BNB)**

---

Bennett Cohen, Polsinelli, Shughart P.C., Denver, Colorado (Jon Hertzog,
Attorney at Law, Colorado Springs, Colorado and Jeff Nobel, Attorney at Law,
Denver, Colorado, with him on the briefs) for Plaintiff-Appellant.

Rachel A. Yates, Holland & Hart, LLP, Greenwood Village, Colorado (Michael S.
Beaver, Holland & Hart, LLP, Greenwood Village, Colorado and Marcy G. Glenn,
Holland & Hart, LLP, Denver, Colorado, with her on the briefs) for Defendants-
Appellees.

---

Before **O'BRIEN**, **ANDERSON** and **McCONNELL**, Circuit Judges.

**McCONNELL**, Circuit Judge.

In 2004, Tina Garcia filed this action against her insurer, seeking payment of benefits under a disability policy. Over the course of the litigation, the district court concluded that Ms. Garcia "willfully, knowingly, [and] intentionally" fabricated a number of discovery documents in an effort to win her case. Mag. Op. 15; Dist. Ct. Op. 12–14. As a result, in addition to granting Berkshire's motion for summary judgment on the merits, the district court separately and independently dismissed the action as a sanction for Ms. Garcia's abusive litigation practices. Because we conclude that the district court did not abuse its discretion by dismissing Ms. Garcia's action as a sanction for her improper actions, we affirm its judgment without reaching the merits of her claims.

## I. Background

In 1991, Ms. Garcia purchased a disability policy from Berkshire, under which she would receive benefits if "due to injury or sickness [she was] unable to perform the material and substantial duties of [her own] occupation," and she was "not engaged in any occupation in which [she] might reasonably be expected to engage with due regard for [her] education, training, experience, and prior economic status." Aple. Supp. App. 305.

At the time that she purchased the policy, Ms. Garcia was the CEO of a real estate company called Special Properties, Inc. ("SPI"), which held a contract with

the United States Department of Housing and Urban Development ("HUD"). In 1998, HUD undertook a criminal investigation of SPI and terminated its contract after finding billing irregularities and fraudulent invoices. The following year, SPI sued HUD in a matter ultimately dismissed without prejudice by stipulation of both parties.

At around this time, Ms. Garcia first filed for benefits under her policy, claiming that she was suffering from post-traumatic stress disorder and a chronic sleep disorder. She later argued that her disability was aggravated by two subsequent developments. First, the psychiatrist treating Ms. Garcia admitted to having sex with her. Second, Ms. Garcia suffered multiple injuries from a rear-end motor vehicle collision in September 2002. This accident allegedly resulted in cognitive impairment.

Berkshire eventually paid full benefits on Ms. Garcia's claim through August 6, 2003, under a reservation of rights until its investigation of her claim could be completed. As of that date, however, Berkshire suspended payment of benefits, contending that Ms. Garcia had failed to comply with certain provisions of her policy requiring her to establish proof of her loss. *See* Aple. Supp. App. 281. Although Berkshire ultimately approved Ms. Garcia's claim for total disability benefits as of February 1, 2007, it refused to pay benefits for the period between August 2003 and February 2007, primarily because of Ms. Garcia's alleged "failure to comply with critical policy provisions." Amongst other

deficiencies, Berkshire claimed that Ms. Garcia had failed to submit to an independent medical examination until 2007, and withheld the authorization Berkshire required in order to get access to her medical records. *See id.* at 281–82.

These omissions were important because Berkshire questioned the legitimacy of Ms. Garcia's disability claim before 2007. In particular, it noted that during the period before 2007 in which Ms. Garcia had claimed to be totally disabled due to cognitive defects, Ms. Garcia had obtained a Juris Doctor degree from the University of Denver College of Law, where she was named an "Outstanding Law Graduate," and subsequently completed a Masters program. Moreover, Berkshire noted that it appeared that Ms. Garcia had operated a real estate business during 2002, three years after the time she had first claimed total disability. Berkshire concluded that because of Ms. Garcia's alleged failure to comply with Berkshire's requests for an independent medical examination and access to medical records during the 2003–2007 period, it could not meaningfully evaluate whether Ms. Garcia had been totally disabled within the meaning of the policy during that time.

After the dispute proceeded to litigation, both sides filed motions for summary judgment on the merits. In addition, Berkshire later filed a Motion for Sanctions, asserting that Ms. Garcia falsified or fabricated at least four documents submitted during discovery. The magistrate judge held a hearing on Berkshire's

Motion for Sanctions on November 14, 2007, at which Ms. Garcia testified concerning each of the allegedly fabricated documents. The magistrate judge found Ms. Garcia's testimony at the Sanctions hearing to be "incredible," and "refuse[d] to rely on any of it." *Id.* at 4. *See also* Mag. Op. 13 (stating that "plaintiff's willingness to lie knows no bounds"). The magistrate judge concluded that Ms. Garcia prepared fabricated evidence "willfully, knowingly, intentionally, after careful contemplation, for self-serving purposes, and with a full understanding of the impropriety involved." *Id.* at 15.

The magistrate judge noted that at least two of the falsified documents were directly related to Ms. Garcia's claims. First, Ms. Garcia submitted a letter, purportedly written by Earl Schoenborn, a former Berkshire claims adjuster, that appeared to be a smoking gun in support of her claims. In the letter, Mr. Schoenborn is alleged to have written:

> I left [Berkshire] after Berkshire refused to honor disability claims of several female policy holders. I was distressed and told [Ms. Garcia] so, to witness Berkshire's denial of legitimate claims of disabled and dying women clients.
>
> I can testify based on personal knowledge that Berkshire used unfair business practices contrary to policy provisions in order to delay or deny payment of valid claims. Berkshire's tactics include 'stall and starve', delay pay' (on the courthouse steps) and manipulate claimant's attorney to advocate taking a settlement paying back benefit and lawyers without recovery for the financial damages.

*Id.* at 9. The letter went on to suggest that Mr. Schoenborn had contacted a current Berkshire employee and learned that Berkshire's "only defense" was not a

real defense under the policy. *Id.* at 9–10. But Mr. Schoenborn repudiated the letter in full, stating that he "[a]bsolutely, completely, definitively, totally . . did not write that letter," and that "the letter contains false statements that [he did] not agree with and which should not be attributable [to him]." *Id.* at 10.

Likewise, the magistrate judge found that Ms. Garcia fabricated a document allegedly prepared by Patrick Renfro, Ms. Garcia's vocational rehabilitation expert, and submitted to the Colorado Board of Law Examiners ("CBLE") in support of Ms. Garcia's application for special accommodation (double time) when taking the bar exam. While Mr. Renfro's actual report described Ms. Garcia's symptoms as occurring "secondary to a *mild to* moderate head injury or a post-concussive syndrome as well as stress, *depression*, chronic pain, and possible iatrogenic (medication) effects," the report Ms. Garcia submitted to CBLE and the district court omitted the italicized words—making her head injury appear more severe and minimizing the extent to which depression caused Ms. Garcia's symptoms. R. Vol. IV, Doc. 196, at 4–5. In addition, the submitted report was doctored to explicitly suggest that Ms. Garcia required "double time" for her Bar Exam when Mr. Renfro had made no such recommendation. He too repudiated the report attributed to him, testifying that he "had absolutely no knowledge of this report in any way, shape, or form." Mag. Op. at 6.

The magistrate judge also found that Ms. Garcia forged two additional documents: (1) a letter by Dr. Robert Kooken, Ms. Garcia's neuropsychologist, in

which he had supposedly indicated that it was medically necessary that she be treated by another psychiatrist; and (2) an email string purportedly between Ms. Garcia and Gene Lupia, a former professional colleague, which Ms. Garcia submitted to the magistrate judge when attempting to justify why attorney fees should not be assessed against her. Although the magistrate judge recognized that these latter two fabrications were less directly relevant to Ms. Garcia's claims at trial, he noted that they still bore on Ms. Garcia's credibility and raised "substantial doubt . . . as to the authenticity of any document relating to this case." *Id.* at 13–14.

The magistrate judge ultimately concluded that this was "an especially egregious case," finding that "[t]he fabrications were prepared over a period of years and are calculating, carefully constructed, and self-serving." *Id.* at 14. He recommended that Berkshire's Motion for Sanctions be granted and that Ms. Garcia's claims be dismissed with prejudice. *Id.* at 19. The district court "conclude[d] that the Magistrate Judge's recommendation is correct in all respects." Dist. Ct. Op. 12. Upon *de novo* review of the record, it agreed that the magistrate judge's findings of fact were, at minimum, "supported by clear and convincing evidence." *Id.* at 13. As a result, the court granted Berkshire's motion for sanctions. Separately, the district court granted Berkshire's motion for summary judgment on the merits, largely premised on the conclusion that Ms. Garcia did not comply with the proof of loss requirements in her policy, and that

therefore Berkshire did not breach the insurance policy as a matter of law. *Id.* at 8–9. Ms. Garcia appealed.

## II. The District Court's Dismissal of Ms. Garcia's Claim as a Sanction

A district court has inherent equitable powers to impose the sanction of dismissal with prejudice because of abusive litigation practices during discovery. *See TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915 (9th Cir. 1987); *cf. Archibeque v. Atchison, Topeka & Santa Fe Ry. Co.*, 70 F.3d 1172, 1174 (10th Cir. 1995); Fed. R. Civ. P. 37(b)(2)(A). "Because of the harshness of dismissal, however, due process requires that the violation be predicated upon willfulness, bad faith, or [some] fault of petitioner rather than inability to comply." *Archibeque*, 70 F.3d at 1174 (internal quotation omitted). While recognizing that there is no rigid test for determining when such a sanction is appropriate, we have suggested that a district court ought to evaluate five factors before imposing a dismissal sanction: (1) the degree of actual prejudice to the defendant; (2) the amount of interference with the judicial process; (3) the culpability of the litigant; (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for non-compliance; and (5) the efficacy of lesser sanctions. *See Ehrenhaus v. Reynolds*, 965 F.2d 916, 920–21 (10th Cir. 1992). We review a district court's decision to impose such a sanction for abuse of discretion. *See Archibeque*, 70 F.3d at 1174.

The district court concluded that almost all of these factors counseled in favor of the sanction of dismissal with prejudice.[1] The court first determined that the prejudice to Berkshire was overwhelming because it had been forced to defend a lawsuit pervaded by false evidence. As the court noted, "[t]he defendants have been put to enormous additional effort and expense to ferret out plaintiff's lies and to double check every piece of information." Mag. Op. 16. The court further concluded that it had "absolutely no confidence that [Ms. Garcia] would not attempt to offer additional false evidence at a trial." *Id.*

The court next found that Ms. Garcia had "interfered egregiously with the court's administration of justice" and that Ms. Garcia was culpable for the fabrications. *See id.* at 17–18. Specifically, the court determined that Ms. Garcia "acted willfully, knowingly, intentionally, after careful contemplation, for self-serving purposes, and with a full understanding of the impropriety involved." *Id.* at 15. Although the court acknowledged that it had not warned Ms. Garcia of the possible sanction of dismissal, it nevertheless concluded that Ms. Garcia's misconduct required dismissal—reasoning that "imposition of a monetary sanction, exclusion of falsified evidence, and exclusion of testimony" would have

---

[1]Although the magistrate judge produced the initial analysis of Berkshire's Motion for Sanctions, the district court adopted and incorporated it in full, concluding that it was "correct in all respects." Dist. Ct. Op. 12. For ease of discussion, we attribute the cumulative analysis to the district court.

been insufficient to deter those "who would manufacture evidence and attempt to cover it up." *Id*. at 18.

In her appellate briefs, Ms. Garcia contended that the district court erred in concluding that she was "clearly and convincingly" culpable as to the claimed fabrications. Aplt. Br. 45–52. Accordingly, this court devoted significant time prior to oral argument to an examination of the factual record. At oral argument, however, Ms. Garcia's counsel abruptly abandoned any attempt to contest the factual findings regarding culpability, indicating that Ms. Garcia was "not going to challenge the trial court's findings that those documents were fabricated." While we appreciate counsel's candor during oral argument, we regard this switch in position as unfortunately typical of Ms. Garcia's behavior throughout this case. Ms. Garcia seems inclined to raise factual smoke screens only to assert, after the facts are revealed, that the truth of the matter was irrelevant.

Having closely examined the arguments of the parties, we cannot find that the district court has abused its discretion by concluding that the severe sanction of dismissal was warranted. The submission of falsified evidence substantially prejudices an opposing party by casting doubt on the veracity of all of the culpable party's submissions throughout litigation. The prejudiced party is forced either to attempt independent corroboration of each submission, at substantial expense of time and money, or to accept the real possibility that those discovery

documents submitted by the opposing party are inaccurate. Nor is the exclusion of the fabricated evidence always enough to deter discovery misconduct. "Litigants would infer that they have everything to gain, and nothing to lose, if manufactured evidence merely is excluded while their lawsuit continues." *Pope v. Federal Express Corp.*, 138 F.R.D. 675, 683 (W.D. Mo. 1990).

Although Ms. Garcia did not receive an explicit warning that dismissal would be a likely sanction for fabricating evidence, this is not a prerequisite to the imposition of dismissal sanctions. *See, e.g.*, *Archibeque*, 70 F.3d at 1175 (upholding dismissal even though no warning given). In addition, we have noted that where false answers are given "under oath," as was the case with the responses to interrogatories here, *see* Fed. R. Civ. P. 33(b)(3), additional warnings are "superfluous at best." *Chavez v. City of Albuquerque*, 402 F.3d 1039, 1045 (10th Cir. 2005). "Once a witness swears to give truthful answers, there is no requirement to warn him not to commit perjury or, conversely to direct him to tell the truth. It would render the sanctity of the oath quite meaningless to require admonition to adhere to it." *Id.* (citation omitted).

We have previously authorized the imposition of dismissal sanctions in cases involving discovery violations arguably less egregious than this one. In *Ehrenhaus*, for instance, the district court dismissed Mr. Ehrenhaus's case for failure to appear at a scheduled deposition, when Mr. Ehrenhaus had asserted that

-11-

it was essential that the deposition be delayed so that he could attend a business meeting in New York in order to "save his business from bankruptcy." 964 F.2d at 919. In that case, there was no suggestion that the party against whom the sanction was imposed had intentionally submitted false evidence or deceived the court. Nevertheless, we upheld the sanction.

The facts of *Archibeque* are closer to this case. In *Archibeque*, Ms. Archibeque sought damages from a railway company for personal injuries allegedly sustained while working for the company. In her responses to discovery questions seeking her complete medical records, Ms. Archibeque withheld information about prior injuries that would have weakened her claim for damages. *Archibeque*, 70 F.3d at 1173. Although she denied any intent to conceal her prior injuries, and explained her failure to provide the records as a "mere oversight," the district court granted the railway company's motion for dismissal as a sanction. *Id.* at 1175. We again affirmed. If the omission of discovery evidence was sufficient to justify the sanction of dismissal in *Archibeque*, it seems clear that the affirmative fabrication of evidence is likewise sufficient to justify dismissal here.

Ample evidence supported the conclusion that Ms. Garcia was herself culpable for the fabrications submitted in this case. Numerous inauthentic documents were submitted over a several year period, counseling against an

explanation of mistake. Moreover, the fabrications were carefully constructed to look like authentic documents. Letters were made to look as though they were printed on authentic letterhead; emails were carefully spliced together so as to appear accurate; fax banners were added to documents to disguise their origin. *See* Mag. Op. 14–15; *see also* Aple. Br. 15–28. Finally, Ms. Garcia's evasive, inconsistent answers and inability to provide an explanation for the fabrications during the hearing cast further doubt on her accounting of events. *See, e.g.*, Mag. Op. 10–13. "We give the district court's determinations regarding the credibility of witnesses great deference." *Wessel v. City of Albuquerque*, 463 F.3d 1138, 1145 (10th Cir. 2006). Accordingly, the district court was well within its discretion to determine that the evidence clearly and convincingly supported the conclusion that Ms. Garcia intentionally fabricated the documents.

Ms. Garcia, however, attempts to argue that a dismissal sanction here is inappropriate for a variety of reasons. Ms. Garcia first argues that even if the documents were fabrications, they cannot provide a basis for a dismissal sanction, because they had "absolutely no materiality or relevance to the substantive issues of [this] case." Aplt. Br. 55. As an initial matter, even accepting her factual premise, it is hard to see why her legal conclusion follows. A party's willingness to fabricate evidence bears on character and credibility, which often is broadly at issue in a given case. In addition, when a party wilfully submits false evidence, it

imposes substantial burdens not only on the opposing party, but also on the judicial system itself, as the extent and relevance of the fabrication are investigated. The lack of "materiality or relevance" is often not apparent until the later in the litigation, when the plaintiff's legal theory is clarified. By then, however, costs will have already been inflicted and the damage done. Moreover, when false evidence or testimony is provided under oath, knowingly and with intent to deceive, a party commits a fraud on the court. It would be odd, therefore, if a court's power to impose the admittedly severe sanction of dismissal depended only on the falsehood's relevance to the parties' claims, and failed to account for the act's interference with the judicial process.

Neither of the cases Ms. Garcia relies on, *Fjelstad v. Am. Honda Motor Co., Inc.*, 762 F.2d 1334 (9th Cir. 1985) or *Phoceene Sous-Marine, S.A. v. U.S. Phosmarine, Inc.*, 682 F.2d 802 (9th Cir. 1982), support her contention that wilful production of false evidence is insufficient to justify a dismissal sanction unless the evidence is particularly material. In both those cases, the Ninth Circuit found that outright dismissal was an inappropriate sanction where the litigant's alleged misconduct was "wholly unrelated to the matters in controversy," *Phoceene Sous-Marine, S.A.*, 682 F.2d at 806, but simply facilitated the *delay* of trial or discovery. *See id.* ("[The litigant's] deception related not to the merits of the controversy but rather to a peripheral matter: whether [the litigant] was in fact to

-14-

ill to attend trial on October 10."; *Fjelstad*, 762 F.2d at 1338 (noting that Honda Limited's refusal to disclose discovery information before its parent company was joined as a party "did not deceive the court about the issues in controversy"). Here, in contrast, Ms. Garcia's deceptions concerned the issues in controversy, rather than an attempt to delay discovery or trial as in *Phoceene Sous-Marine, S.A.* or *Fjelstad*.

Nevertheless, we need not decide the question in this case, because we agree with the district court that at least two of Ms. Garcia's fabrications were directly relevant to her claims. The fabricated Renfro report supported Ms. Garcia's claim that she was totally disabled—a central issue in the litigation. Meanwhile, Mr. Schoenborn's letter purported to expose "unfair business practices" by which Berkshire intentionally sought to delay or avoid the payment of earned benefits—precisely Ms. Garcia's theory of the case. In fact, despite initially maintaining that all of the asserted fabrications "have absolutely nothing to do with" her merits claims, Aplt. Br. 57, Ms. Garcia's counsel conceded at oral argument that the Schoenborn letter was relevant to the merits.

Ms. Garcia next suggests that her alleged disabilities could explain the fabrications. Indeed, Ms. Garcia's counsel spent substantial time at the sanctions hearing attempting to develop expert testimony on whether the fabrications could have been the result of impulse spurred by Ms. Garcia's disability,

"hypothetically" assuming her involvement. *See, e.g.*, Aple. Supp. App. 59–60. But the district court explicitly addressed and rejected the suggestion that Ms. Garcia's actions were the product of her disability and found that "the suggestion that the fabrications and plaintiff's willingness to lie are irrational acts of uncontrollable impulse are belied by the facts." Mag. Op. 14. Even Ms. Garcia's own expert testified that, assuming her disability would have led her to fabricate the document, it would not have prevented her from appreciating the difference between the propriety or impropriety of those actions by the time of the hearing. Aple. Supp. App. 57–58. Ms. Garcia's unwillingness to take responsibility for the fabrications leading up to or at the hearing therefore makes less likely that they were the product of a temporary, disability-induced, impulse. Instead, we think the district court was within its discretion to conclude that the fabrications were the product of an intentional act, performed "after careful contemplation." Mag. Op. 15.

Finally, Ms. Garcia argues that Berkshire must prove all of the elements of common law fraud in order to prevail on its motion for sanctions. But we have never required such findings in order to sustain a court's imposition of dismissal sanctions. *See, e.g.*, *Ehrenhaus*, 965 F.2d 916. Moreover, we note that the affirmative submission of false evidence is, at minimum, akin to a fraud on the

court, which other courts have found may justify the sanction of dismissal. *See Allen v. Chi. Transit Auth.*, 317 F.3d 696, 703 (7th Cir. 2003).

For all these reasons, we conclude that the district court did not abuse its discretion by concluding that the severe sanction of dismissal was warranted in this case.

### III. Attorney's Fees on Appeal

Berkshire has also filed a motion seeking damages and costs related to this appeal, on the theory that it is frivolous. Most troubling, Berkshire suggests that Ms. Garcia submitted new false evidence to the district court and this court *after* the imposition of the dismissal sanction. *See* Aple. Mot. Fees 9–11. In her reply brief on appeal, Ms. Garcia cited a letter from Craig Durkin, the former Director of the Office of Procurement and Contracts at HUD, supposedly exonerating her from the agency's criminal investigation. *See* Aplt. R. Br. 3–4. But Mr. Durkin has denied writing the letter and questioned its authenticity. *See* Aff. of Craig Durkin 1–2. Likewise, Berkshire has raised questions about two other documents relied upon by Ms. Garcia after the district court's dismissal of her case: new evidence that Ms. Garcia supposedly authorized the release of her medical records in 2003–04 and a new version of the Renfro report previously found fabricated in the district court's sanctions ruling. *See* Aple. Mot. Fees 8. The district court, in

resolving Ms. Garcia's Fed. R. Civ. P. 60(b) Motion for Relief from Order, noted that "Berkshire has a strong argument in support of its claim that the new authorizations . . . are fabrications." Dist. Ct. 60(b) Ruling 10.

"An appeal is not frivolous per se just because the presentation of the issues in district court was bad enough to be sanctionable." *Lewis v. Comm'r of Internal Revenue*, 523 F.3d 1272, 1278 (10th Cir. 2008) (citation omitted). On the other hand, "[a]n appeal may be frivolous if it consists of irrelevant and illogical arguments *based on factual misrepresentations and false premises*, or when the result is obvious, or the appellant's arguments of error are wholly without merit." *Id.* (emphasis added) (citations omitted). We believe that if these new documents turn out to have been fabrications, it follows that the appeal was based in part on "factual misrepresentations," making appellate-level sanctions appropriate.

There have been no explicit factual findings regarding the authenticity of the Durkin letter, the medical records release, or the version of the Renfro report submitted to court. As an appellate court, we have no capacity to engage in such fact-finding. We therefore remand this case to district court for the limited purpose of determining whether these three documents were fabricated and if so, whether the fabrication was intentional. If the district court answers both questions in the affirmative, we request that the district court calculate a reasonable award of attorney's fees for the appeal. *See Hoyt v. Robson Cos., Inc.*,

11 F.3d 983, 985 (10th Cir. 1993) ("[A]n application for appeal-related attorneys' fees must first be made to our court. Should we decide that it is appropriate to award such fees, we may then remand to the district court to determine an award of reasonable fees.").  Upon conclusion of these factual findings, we retain jurisdiction to make the ultimate determination as to whether and what fees to award under Fed. R. App. P. 38.


## IV. Conclusion

For the foregoing reasons, we AFFIRM the district court's dismissal of Ms. Garcia's claims as a sanction for her abusive litigation practices.  We therefore need not address the district court's summary judgment ruling regarding the merits of Ms. Garcia's claims.  Finally, we REMAND to the district court to determine whether certain documents cited by Ms. Garcia on appeal were fabricated, and retain jurisdiction for the purpose of determining whether to impose sanctions on appeal.  Appellees' motion to strike is DENIED as moot.