[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-10907

Non-Argument Calendar

_____

HILTON GERMANY,

Plaintiff-Appellant,

JONNIE BEY,

Plaintiff,

*versus*

CITY OF HUNTSVILLE, et al.,

Defendants,

OFFICER SLATER,
Individually,
RICHARD FLANNERY,

23-10907                Opinion of the Court                2

OFFICER WILLIAM HALL,
Individually,
OFFICER KEITH WOODEN,
Individually,

Defendants-Appellees.

————————————

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 5:18-cv-01745-LCB

————————————

Before NEWSOM, LAGOA, and ANDERSON, Circuit Judges.

PER CURIAM:

Hilton Germany, Jr., proceeding *pro se*, appeals the district court's dismissal with prejudice of his *pro se* civil rights suit, as a sanction for misconduct during the litigation. Germany also appeals the district court's failure to recuse and the district court's order grating partial summary judgment against him. For the following reasons, we affirm.

**I.**

Although this is an appeal of a dismissal, it is not (as we will explain) an appeal arising from a motion to dismiss under Federal Rule of Civil Procedure 12. That is to say, we need not take the

23-10907                 Opinion of the Court                 3

well-pled allegations as true for our purposes.  Instead, we recite the undisputed facts as they were established at the time of summary judgment.[1]

On October 23, 2016, Germany called 911 and asked for police to come to his home and remove his wife.  He began the call by telling the dispatcher, "I'm not trying to be funny.  I'm fucking serious. . . . I need a police officer to come out here."  The dispatcher took down his address and asked what happened.  Germany responded, "I just need a police officer to come out here.  That's what I'm requesting."  When the dispatcher asked again, "what happened?", Germany doubled down, replying "No, motherfucker.  I just told you what the fuck I need, right?  So that's what I need you to do."  "I don't give a fuck about your job," he continued, demanding "Look man, just send the fucking police out.

---

[1] The events underlying this suit were captured on video by the officers' bodycams.  That video footage, along with recordings of 911 calls that Germany placed, were filed on the record as summary-judgment exhibits. Because neither party disputed the authenticity of those video and audio recordings, the district court treated the recordings as undisputed evidence. This is consistent with the Supreme Court and our Circuit's precedents.  *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (holding that, where a video—whose authenticity the plaintiff hadn't attacked—"so utterly discredited" the plaintiff's version of events, "the Court of Appeals should not have relied on such visible fiction [as the plaintiff's testimony]; it should have viewed the facts in the light depicted by the videotape."); *Morton v. Kirkwood*, 707 F.3d 1276, 1284 (11th Cir. 2013) ("[W]here an accurate video recording completely and clearly contradicts a party's testimony, that testimony becomes incredible."); *id.* ("At times, we too have discarded a party's account when the account is inherently incredible and could not support reasonable inferences sufficient to create an issue of fact.").

That's all I asked for."  Then Germany hung up.  He called back a few minutes later and reached a different dispatcher.  This time, he identified himself, gave his address, and repeated his request to have someone removed from his home.  He told this dispatcher, "I need someone to bring a police officer.  I'm trying to restrain myself from killing anybody. . . . I just need someone to come to remove a person."

Officer Hall was the first to arrive at the scene.  He found Germany standing in the front yard and asked Germany what was going on.  Germany explained that he wanted his wife removed from the home.  Hall told Germany that, because the couple was married, he could not make Germany's wife leave her own home.  To that, Germany replied "Well, I'm just letting y'all know, I don't want to have no problem with someone getting killed."  Hall counseled Germany to be careful with his words because "if she hears you saying that, she can press charges."  Hall then tried to ask Germany what exactly happened and whether Germany had any injuries, but Germany refused to provide any details—he merely reiterated his desire to have his wife removed.  Hall asked for Germany's name, and he replied "Hilton."  Hall then asked for Germany's last name, and Germany became irate, telling Hall that he does not like to repeat himself.  Hall told Germany there was no need to become disrespectful and that he was there to help, and Germany began shouting, "I don't give a fuck.  Get the fuck up out of here."  At this point, Jonnie Bey (Germany's mother) came out of the house and approached Germany and Hall, explaining, "My son has PTSD. . . . I'm trying to explain to you, my son has PTSD.

. . . If you keep asking him the same things, he is going to have a problem." After Germany began screaming obscenities on the front lawn, Hall told Germany to put his hands behind his back. Rather than comply with Hall's order, Germany turned away from Hall and walked back toward the house, yelling "this is my motherfucking property." Hall followed Germany to the front porch and, as Germany reached the door, Hall told Germany "you need to come back down here." Germany shouted back that Hall needed to "get the fuck up out my property," and walked inside the house.

Hall stated in a sworn declaration that, based on Germany's "loud, profane, and violent language and his repeated statements that he wanted his wife out of the house, [Hall] was concerned that Germany's earlier threats that he might kill someone might be directed at his wife." Based on that fear and the Huntsville Police Department's domestic violence policy, which requires officers to "take reasonable measures to assist and/or assure the immediate safety of every person who may be affected," Hall decided he needed to keep Germany away from anyone else in the house to deescalate the situation. Hall, therefore, followed Germany to the front porch, but Bey stepped in to block his path. When Hall (again) instructed Germany to come back down to the yard, Germany yelled back, "Get the fuck up out of here. . . . Get the fuck off my property." Germany then entered the home and stood, in Hall's view, behind the glass door. Backup then began to arrive.

Bey positioned herself between Germany (in the front door) and Hall (at the front steps), blocking Hall's pathway. She reiterated Germany's distaste for answering questions; Hall's questions, she said, pushed Germany "from 0 to 1000," and she was unable to control Germany when he was "at this level" because of his size. Bey also told Hall that Germany could not control himself when he is "out of control" and angry. When Germany yelled over his mother with another profanity-laced tirade, Bey begged her son, "I'm your voice of reason, let me talk, please."

Hall explained that as a matter of state law, because the situation involved domestic violence, he needed Germany to come back outside and talk. Hall made clear to Bey that if Germany did not come out, Hall would have to go in. As Germany turned away from the door and started pacing inside the house, Hall asked Bey if there were any weapons in the house, and Bey said she was not aware of any.

During most of this interaction, Germany was standing immediately inside the glass front door, in Hall's line of sight. But as Hall spoke to Bey, Germany moved further into the house and disappeared from view. Hall ordered, "Sir, I need you to come back here," to no avail. Then, over Bey's protests, Hall (followed by Officers Wooden, Flannery, and Slater—all of whom had arrived while Hall was talking to Germany and Bey) entered the home. Inside, the officers found Germany walking down a staircase next to the kitchen. Hall told Germany he was under arrest and ordered him to put his hands behind his back. When

Germany questioned why ("I ain't turning around.  For what?"), Hall told him he was being arrested for disturbing the peace. Germany, increasingly argumentative, responded "It's my fucking property.  I can say whatever I want."  Flannery chimed in and told Germany to cooperate with Hall, but Germany turned his anger on Flannery, telling him to "shut the fuck up.  Like I said, I'm not about to fucking go nowhere."

Faced with Germany's increasing anger and lacking cooperation, Wooden sprayed Germany with oleoresin capsicum ("OC," or pepper spray).  A struggle then ensued as the officers tried, for approximately one minute, to handcuff Germany.  The bodycam footage shows a chaotic scene, with multiple officers grappling with Germany, their commands to "put your hands behind your back" muddled with screams from Germany's family members and a crying baby.  After about 35 seconds, the officers got Germany down to the ground where he continued to struggle. After another 30 seconds or so on the ground, the officers handcuffed Germany.

The parties all agree that Flannery, Hall, Wooden, and Slater all struck, punched, or used pressure-point holds on Germany during the scuffle, but because of the chaotic scene and close range, the bodycam footage does not show precisely what happened after Germany was on the ground.  After Germany was cuffed, he first refused to move outside voluntarily.  But once the officers lifted him to his feet, he cooperated with their effort to walk him outside to a patrol car.

23-10907                Opinion of the Court                8

The day after his arrest, Germany went to the hospital. He had some bruising below his right eye and on his upper arms; he complained of "mild pain on multiple locations"; and he denied ever having lost consciousness. The physician who treated Germany prescribed medication to treat his pain and sent him home.

Germany was charged with resisting arrest and disturbing the peace, but the Huntsville prosecuting attorney filed a motion for nolle prosequi, which the state court granted.

In 2018, Germany and Bey paid the requisite fee and filed their suit alleging false arrest, excessive force, and assault and battery. In the complaint, Germany and Bey named Officers Slater, Flannery, Wooden, Hall, and Sellers as defendants, all in their individual capacities.[2] In their Second Amended Complaint, Germany and Bey asserted fourteen claims, falling into five categories: (1) a false arrest of Germany by Officer Hall (Count 1); (2) excessive force against Germany by Officers Slater, Flannery, Wooden, Hall, and Sellers (Counts 2 to 6); (3) excessive force against Bey by Officer Hall (Count 7); (4) assault and battery against

_____

[2] Germany also named the City of Huntsville, Alabama ("the City"), as a defendant. The district court later granted summary judgment to the City based on a state law grant of immunity. But Germany does not challenge the ruling in favor of the City on appeal, so he has abandoned the issue. *See United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court sua sponte [only] in extraordinary circumstances.").

Germany by Officers Slater, Flannery, Wooden, Hall, and Sellers, and the City of Huntsville (Counts 8 to 13); and (5) assault and battery against Bey by Officer Slater (Count 14).  The Defendants answered, denied liability, and asserted defenses.

Following discovery, each of the Defendants moved for summary judgment.[3]  The Defendants all argued that, among other things, they were entitled to qualified immunity from the § 1983 claims and state-agent and statutory immunity from any state law claims.  In support, they submitted joint evidentiary materials, including police policies, bodycam videos from the officers, transcripts and recordings of Germany's calls to 911, depositions of the parties, and Germany's arrest report.

Following a hearing, the district court issued an order on the summary judgment motions.[4]  After reviewing bodycam footage of the underlying incident—the authenticity of which was not in dispute—the district court found that the officers were entitled to qualified immunity on all of Bey's claims and many of Germany's.

Officer Hall, the district court concluded, was entitled to qualified immunity on Germany's false arrest claim because at least

---

[3] Officers Sellers and Flannery also moved for judgment on the pleadings. That motion does not feature in the present appeal.

[4] The district court granted summary judgment to all Defendants as to Bey's claims.  Bey did not file a notice of appeal or join in Germany's notice and is not a part of this appeal.  And, as we've said, Germany has not appealed the district court's grant of state-law immunity to the City.  We consider, therefore, only the summary judgment rulings relevant to Germany's claims against the officers.

arguable probable cause existed for Germany's arrest under the City's ordinance for disturbing the peace. Further, the district court found that Officer Hall was permitted to enter Germany's house without a warrant under the exigent-circumstances and rendering-aid exceptions. Thus, the district court granted Officer Hall's motion for summary judgment based on qualified immunity as to Count 1.

The district court also found that all the officers were entitled to partial summary judgment on Germany's excessive-force claims (counts 2 to 6) because most—but not necessarily all—of their conduct during his arrest merited qualified immunity. The district court, having already determined that Germany's arrest was proper, turned to whether the force used was proper. Examining reasonableness under *Graham v. Connor*, 490 U.S. 386 (1989), the district court concluded that the officers were forced to respond quickly to Germany's hostile behavior and that their initial use of force was objectively reasonable under the circumstances. Accordingly, they were entitled to qualified immunity for their actions up until the time that Germany was prone on the ground. The district court also found that the Defendants' actions of spraying Germany with OC, using hand strikes before he was taken to the ground, and wrestling him to the ground were justified under the circumstances.

The district court noted, however, that Germany testified that the officers continued to choke and punch him after he had given up and was handcuffed, and, if Germany's allegations were

proven true, the officers would not be entitled to qualified immunity for this conduct. While the officers denied this allegation, the video footage during the approximately thirty-second period after Germany was taken to the ground was unclear because of the physical struggle and chemic spray. The video did not clearly show when Germany was handcuffed or whether he was choked. Thus, the district court found that a genuine dispute existed as to whether Defendants used excessive force in completing the arrest, and, accordingly, it denied summary judgment as to whether the officers were entitled to qualified immunity for their actions after Germany was taken to the ground, as alleged in Counts 2 to 5. Thus, the district court granted summary judgment, in part, to Defendants as to Counts 2 to 6, based on qualified immunity for their conduct before wrestling Germany to the ground.

The district court also found that the officers were entitled to summary judgment on Germany's assault and battery claims, with a similar limited exception, because most of their conduct during his arrest merited qualified immunity. Germany's assault and battery allegations were essentially the same as his excessive force allegations, so the district court analyzed the claims together. The court granted summary judgment in part and denied it in part as to Counts 9 to 13, with the same distinction as the counts for excessive force.[5]

---

[5] Officer Sellers later moved to reconsider its denial of his motion. The district court agreed and entered summary judgment in his favor because "the

The remaining Defendants—Officers Slater, Flannery, Wooden, and Hall—prepared to defend themselves at trial concerning whether they committed assault and battery, or used excessive force, *after* wrestling Germany to the ground. In October 2021, Germany's counsel withdrew from the case with leave of the court. After pushing back the trial date a few times, the district court held a status conference in July 2022, during which it ordered the parties to exchange certain trial-related documents by October 1, 2022.

Sometime after this deadline passed, the remaining Defendants moved the district court to sanction Germany under Rule 41(b) based on his alleged refusal to comply. They argued that sanctions were warranted because Germany failed to follow the district court's instruction to submit his opening statement, and, instead, left a voicemail threating to defame defense counsel, their staff, and their law firm. The district court held a hearing on the motion in November 2022 but held it in abeyance, warning Germany to (1) maintain a high standard of civility for the rest of the proceedings, (2) not make faces or giggle in court, and (3) not argue outside the narrow issue remaining at trial.

The district court then scheduled a pretrial conference for February 24, 2023. Germany did not appear at this conference. The remaining Defendants responded by renewing their motion for sanctions, because, in addition to their previous reasons,

---

bodycam footage at issue clearly shows that he did not touch Germany in any way during the process of German's arrest."

Germany continued to defy court orders and wrongly accuse defense counsel of perjury.  They noted that Germany had failed to file a statement of damages or a witness list on time, had not produced his exhibits, and had not attended the pretrial conference in the case, all of which were required by duly issued orders. Germany responded by arguing only that the Defendants improperly submitted motions "when court is not in operating hours and during the weekends and this should not be acceptable."

The case proceeded to trial on February 27, 2023).  After the jury was selected, the district court heard oral argument on the pending motions.  The Defendants argued in support of their renewed motion for sanctions, reiterating their written arguments and highlighting how Germany's noncompliance with pretrial deadlines had limited their ability to adequately prepare for trial. In particular, the Defendants said, "we never received the medical records . . . We never got a damages statement.  There's been various other orders of the Court that have been violated.  And so certainly it's well within the Court's discretion to dismiss this case on any number of those issues, but here we have all of them combined."  Germany argued against the renewed motion for sanctions, claiming that he understood the judge to mean that if he submitted the documents, he would not have to attend the pretrial conference.  He claimed that he suffered from memory loss and blamed the judge for his noncompliance, because "you were not allowing me to write down anything."  Germany also insisted that he "didn't know [he] needed to provide a statement of damages." During Germany's argument, the district court had to remind him

to act and perform in a civil manner and to show respect for the proceedings rather than "shak[ing] his head or tak[ing] an attitude" with the court.[6] The court again held the motion for sanctions in abeyance but warned Germany that he had must follow court orders and that it was "up to [him] going forward whether [he] want[s] this case to survive or not."

Germany's pattern of noncompliance continued throughout trial as he repeatedly disregarded the district court's orders regarding form, procedure, prohibition of certain topics and words, and submission of a damages statement. The court warned Germany throughout trial about his behavior and comments and repeatedly told Germany that, if an attorney had acted anywhere close to his behavior, he or she would have been held in contempt and sanctioned upon the first refusal to follow orders. As one example, after Germany violated a motion in limine order by referring to his arrest as "police brutality" in front of the jury, the district court admonished Germany (out of the presence of the jury) that "Your comments right there in front of the jury were absolutely 100 percent improper. You do that again, then I'm going to have to decide whether I let this case go forward."

During Germany's own testimony, he repeatedly discussed matters which had been excluded as improper. Eventually, in the

---

[6] At this point, the district court specifically cautioned Germany that "If Mr. Canupp shook his head at me, I would probably have him dragged out of here by the marshals. But I am not going to do that to you. I just need you to act in a civil and kind way until we get through this trial."

presence of the jury, the district court cautioned Germany, "Sir, you are trying my patience, I will advise you, sir, that I can dismiss this action if you fail to obey my orders. Now, I am going to ask you to comply with my orders. I do not want to dismiss this action. I want the jury to be able to decide it. But I will use the powers that I should fairly use, because everybody in this trial – you and these officers – deserve a fair trial. And that's what we're going to have." After that last exchange, the district court excused the jury for a recess and the Defendants renewed their motion for sanctions, requesting dismissal because Germany had continuously violated orders and had yet to produce the required damages statement. The district court then summarized all of the actions by Germany that had warranted sanctions and dismissal through day two of the trial. Nevertheless, Germany was permitted to proceed, under threat of sanctions and dismissal upon another violation.

On the third day of trial, in regard to the still-missing damages statement, the district court warned Germany "very honestly, if an attorney was standing there representing you, I can't think of a reason that I would not sanction him, and possibly with dismissal of the case. And so, obviously, Mr. Canupp has made that motion, and I would say that issue is still very much in play." Germany, seemingly nonplussed, replied "I'd just like to say can you please do what you're going to do? Because you keep threatening me. Just do what you are going to do. Are you going to dismiss the case? Dismiss the case. It's fine with me. I'm not going to disagree with you. I am not going to argue." The district

23-10907                Opinion of the Court                16

court again held the motion for sanctions and motion to dismiss under advisement.

Later that day, defense counsel raised to the district court that Germany had (again) violated the district court's in limine order excluding any discussion of the disposition of his arrest and criminal charges. After the district court reiterated its order excluding that topic, Germany reiterated that if the Defendants mentioned his charges (they had not), "I'm definitely going to tell [the jury] I'm not guilty." The court responded, "You're going to continue to defy this order? You're going to continue to refer to the criminal charges? Is that what you're telling me?" Germany replied that he would do as he believed the Defendants had done, which was to discuss the dropped charges.

That same afternoon, the district court admonished Germany for being "disrespectful" and "mak[ing] faces when you sisagree with my ruling," and reminded him that "I expect you to conduct yourself with the same civility that any other person would in this courtroom." When Germany made some mocking hand gesture towards the jury during this exchange, the district court told Germany "Do not use those hand moves. It is disrespectful. Mr. Canupp would be in the jail right now if – I'm talking. You're not talking." "At some point," the district court warned Germany, "I'm not going to put up with this."

The district court then cautioned Germany to "tread lightly" with a witness, to which Germany responded, "Your Honor, can you stop threatening me?" The jury was excused from the

courtroom and the district court reprimanded Germany, explaining, "Sir, when I tell you to follow my orders and the law, that's not a threat. . . . If you are going to keep this up, just go ahead and tell me now. If you are going to continue to not follow my orders, be disrespectful in front of this jury to the attorneys, the parties, and this Court, if you intend to continue to do that, I need to know right now." The district court asked, "Do you intend to follow my orders or not?" Germany responded, "I don't know." The district court then asked, "Are you going to follow my orders and be civil and conduct yourself in a good manner if this trial continues?" Germany responded "I am being civil," and then repeated the same answer three more times, dodging the district court's question of whether Germany would follow orders for the rest of trial. The district court ordered him to be held in contempt.

After a brief recess, the district court sanctioned Germany and dismissed his case with prejudice. The district court explained its rationale as follows:

> For all of the reasons that we've covered in Mr. Canupp's motion for sanctions, your complete disregard for decorum in this Court, your complete disregard for my motions in limine, your failure to comply with my pretrial order, and provide them even a statement of damages even to now, and then your absolute insulting behavior in front of this jury, in front of these parties, in front of this Court and your – and, let me say, and your own unwillingness

to commit to stop doing that, I find your behavior is willful. I find that there is no lesser sanction than the dismissal of your case. This case is dismissed with prejudice.

Then, in a written order memorializing the dismissal, the district court described Germany's behavior as "the worst behavior this [c]ourt has ever observed of a *pro se* litigant, or for that matter, any litigant." In the order, the court explained that it tried to work with Germany as a *pro se* plaintiff, but he made that impossible and showed no remorse for any of his actions). At some great length, the district court detailed Germany's inappropriate behavior before and during trial. It determined there were at least three independent bases for dismissing Germany's case with prejudice as a sanction: (1) he failed to appear at a pretrial conference violating Federal Rule of Civil Procedure 16(a); (2) he violated court orders repeatedly, including by continually referring to matters that were excluded by the its previous order; and (3) his inappropriate behavior at trial that was "hostile, argumentative, and insolent" and "willful and designed to be provocative." The district court noted that it had warned Germany many times regarding his defiance of court orders and inappropriate behavior, yet he disregarded those warnings. Accordingly, the district court dismissed the case with prejudice pursuant to Rules 16(f) and 41(b), and its inherent authority, and granted the Defendants' renewed motion for sanctions.

This appeal ensued.

## II.

First, we address Germany's claim that the district court erred by failing to recuse from his case. We generally review a judge's decision not to recuse himself for an abuse of discretion. *United States v. Berger*, 375 F.3d 1223, 1227 (11th Cir. 2004). But if a party fails to invoke a federal recusal statute to the district court, we review for plain error. *Hamm v. Members of Bd. of Regents*, 708 F.2d 647, 651 (11th Cir. 1983). Under the plain-error standard, an appellant must show that there was (1) an error, (2) that was plain, and (3) the error affected his substantial rights. *Higgs v. Costa Crociere S.P.A. Co.*, 969 F.3d 1295, 1307 (11th Cir. 2020). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quoting *United States v. Smith*, 459 F.3d 1276, 1283 (11th Cir. 2006)).

A judge must *sua sponte* recuse himself "in any proceeding in which his impartiality might reasonably be questioned" or "[w]here he has a personal bias or prejudice concerning a party." 28 U.S.C. § 455(a), (b)(1). "The test is whether an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt about the judge's impartiality." *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1524 (11th Cir. 1988).

"Ordinarily, a judge's rulings in the same or a related case may not serve as the basis for a recusal motion." *McWhorter v. City*

*of Birmingham*, 906 F.2d 674, 678 (11th Cir. 1990). "The judge's bias must be personal and extrajudicial; it must derive from something other than that which the judge learned by participating in the case." *Id.* "The exception to this rule is 'when a judge's remarks in a judicial context demonstrate such pervasive bias and prejudice that it constitutes bias against a party.' Mere 'friction between the court and counsel, however, is not enough to demonstrate pervasive bias.'" *Thomas v. Tenneco Packaging Co.*, 293 F.3d 1306, 1329 (11th Cir. 2002) (quoting *Hamm*, 708 F.2d at 651).

Here, because Germany did not seek recusal or invoke a federal recusal statute before the district court, we review the issue for plain error only. *Hamm*, 708 F.2d at 651. We easily conclude that the district court judge did not commit error, plain or otherwise, by failing to *sua sponte* recuse himself. Nothing in the record suggests that his impartiality could have been reasonably questioned or that he labored under any personal bias or prejudice. And notably, the judge granted Germany far more lenience on his improper behavior than an attorney would have received for the same conduct—a point which the district court repeatedly made on the record below.

Germany's grievance on appeal is based, instead, on non-controversial evidentiary rulings and comments on courtroom etiquette. Germany points to several moments at trial during which the district court judge made rulings that were unfavorable to him: first, Germany complains that "in the opening, the defense

was permitted to argue, over objection, that the plaintiff had reached for an officer's gun, even though everyone knew that not to be the case." The district court overruled Germany's objection, explaining "this is just a statement of what she expects the evidence will show, just as yours was what you expected it would show." There's no appearance of bias or impropriety there.

Second, Germany points to a moment during a witness examination during which he protested, "Your Honor, it seems that y'all rushing me. It been seven years that I been – been police brutalized," and the district court instructed the jury to "disregard the word brutalized. That was an absolutely improper comment." Again, there is no reasonable appearance of bias in a district court's straightforward enforcement of its in limine rulings.

Third, Germany insists the district court "went out of its way to intimidate" his mother when she was being impeached on cross-examination. Germany's mother had contradicted her own deposition testimony and, when confronted with the deposition transcript, she accused defense counsel of misquoting her. The district court then excused the jury and admonished her about truthfulness on the stand, telling her "[I]f you tell something that's not the truth, it is a felony. I am not going to allow something that is not the truth [to] come from this witness stand, and it is as simple as that . . . . If you do not give them a truthful answer, it would be my duty to forward this to the United States Attorney. I will leave it at that." Germany's mother responded, "I'm going to say my

truth because I don't recall it," prompting the district court to again explain that lying under oath is punishable by contempt and that he would have a marshal take her into custody if she weren't truthful. As before, we see no appearance of bias or prejudice in the district court's appropriate admonition of a recalcitrant witness.

Finding no error plain or otherwise, we affirm as to this issue.

## III.

We turn, next, to Germany's appeal of the Rule 41(b) dismissal. We review the dismissal of an action under Rule 41(b) for an abuse of discretion. *Gratton v. Great Am. Commc'ns*, 178 F.3d 1373, 1374 (11th Cir. 1999). Discretion means the district court has a "range of choice, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law." *Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc.*, 420 F.3d 1317, 1324 (11th Cir. 2005) (quoting *Ameritas Variable Life Ins. Co. v. Roach*, 411 F.3d 1328, 1330 (11th Cir. 2005)). "Thus, when employing an abuse of discretion standard, we will leave undisturbed a district court's ruling unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard." *Id.* at 1325.

We construe a *pro se* litigant's pleadings liberally. *Alba v. Montford*, 517 F.3d 1249, 1252 (11th Cir. 2008). But issues not briefed on appeal are deemed abandoned. *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004). An appellant fails to adequately brief a claim when he does not "plainly and

prominently raise it." *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) (quoting *Cole v. U.S. Att'y Gen.*, 712 F.3d 517, 530 (11th Cir. 2013)).  Further, when a district court order is based on multiple, independent grounds, an appellant must show that "every stated ground for the judgment against him is incorrect." *Id.*

Further, although *pro se* parties' pleadings are liberally construed by courts, *pro se* litigants are not relieved from following procedural rules.  *Albra v. Advan, Inc.*, 490 F.3d 826, 829 (11th Cir. 2007).  A district court may dismiss a case for failure to comply with court rules "under the authority of either Rule 41(b) or the court's inherent power to manage its docket."  *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321 n.10 (11th Cir. 2015).  To dismiss with prejudice under Rule 41(b), the court must find that: "(1) a party engage[d] in a clear pattern of delay or willful contempt (contumacious conduct); and (2) the district court specifically finds that lesser sanctions would not suffice."  *Betty K Agencies, LTD. v. M/V MONADA*, 432 F.3d 1333, 1337–38 (11th Cir. 2005) (quoting *World Thrust Films, Inc. v. Int'l Fam. Ent'mt, Inc.*, 41 F.3d 1454, 1456 (11th Cir. 1995)).  A court also has the inherent authority to sanction parties for "violations of procedural rules or court orders," up to and including dismissals with prejudice.  *Donaldson v. Clark*, 819 F.2d 1551, 1557 n.6 (11th Cir. 1987).

As to the first prong of a Rule 41(b) dismissal under *Betty K*, simple negligence will not suffice.  *McKelvey v. AT&T Tech., Inc.*, 789 F.2d 1518, 1520 (11th Cir. 1986).  As to the second prong, a

23-10907                Opinion of the Court                24

district court must "consider the possibility of alternative, lesser sanctions." *Zocaras v. Castro*, 465 F.3d 479, 484 (11th Cir. 2006). But although dismissal with prejudice is a drastic remedy, we have found that "dismissal upon disregard of an order, especially where the litigant has been forewarned, generally is not an abuse of discretion." *Moon v. Newsome*, 863 F.2d 835, 837 (11th Cir. 1989).

Here we note that although the district court provided three independent bases for dismissal—Rule 41(b), Rule 16(f), and its inherent authority to manage the courtroom and docket— Germany only argues on appeal that the sanctions were improper under Rule 41(b). Thus, he has abandoned any argument that dismissal was improper under either Rule 16(f) or the court's inherent authority. *See Sapuppo*, 739 F.3d at 681. Because Rule 16(f) and the district court's inherent authority both constituted independent, alternate grounds for dismissing Germany's case with prejudice, we affirm the district court's order. *See id.*

But even if we consider Germany's arguments on the merits, they still fail. The district court did not abuse its discretion in dismissing his case with prejudice as a sanction under Rule 41(b) because Germany repeatedly failed to follow the Federal Rules of Civil Procedure and the district court's orders, both before and during trial. *See Gratton*, 178 F.3d at 1374; *Betty K*, 432 F.3d at 1337; Fed. R. Civ. P. 41(b). Particularly, Germany's inappropriate conduct included: threatening defense counsel; failing to attend a pretrial conference; making faces and giggling during proceedings; falsely accusing defense counsel of perjury; repeatedly failing to file

his damages statement; repeatedly defying the order excluding mention of the dismissal of his criminal charges; and stating that he would continue to violate orders despite admonishment. This flagrant disregard for the Rules and the court's orders showed a "clear pattern of . . . willful contempt (contumacious conduct)." *See Betty K*, 432 F.3d at 1337–38. Further, dismissal did not come easily, nor was it the result of a kneejerk reaction from the district court: the Defendants sought sanctions several times before and during trial. Each time, Germany had the opportunity to respond. And the district court also warned Germany several times before and during trial that his continued inappropriate behavior would lead it to grant the Defendants' motion and dismiss the case. Given the record evidence we discussed above, we find that the district court's explicit finding that lesser sanctions would not suffice is amply supported. *See Betty K*, 432 F.3d at 1338.

Accordingly, the district court did not abuse its discretion in dismissing the case under Rule 41(b), and we affirm in this respect as well.

## IV.

Germany also challenges the district court's grant of partial summary judgment to the Defendants. We conclude, however, that our affirmance of the dismissal with prejudice renders it unnecessary for us to review the merits of any prior interlocutory order. *See, e.g., Garcia v. Berkshire Life Ins. Co. of Am.*, 569 F.3d 1174, 1183 (10th Cir. 2009) (declining to address summary judgment order given affirmance of dismissal as a sanction for abusive

23-10907                Opinion of the Court                26

litigation practices); *Sere v. Bd. of Trs. of Univ. of Ill.*, 852 F.2d 285, 288 (7th Cir. 1988) (declining to review interlocutory Federal Rule of Civil Procedure 12(b) dismissal order that preceded dismissal of remaining claim as sanction for discovery violation); *Ash v. Cvetkov*, 739 F.2d 493, 497 (9th Cir. 1984) (declining to review earlier interlocutory orders when affirming dismissal for failure to prosecute); *Hughley v. Eaton Corp.*, 572 F.2d 556, 557 (6th Cir. 1978) (declining to review previous interlocutory orders when affirming dismissal for failure to prosecute).  We will not wade back into the merits of Germany's case *after* the district court has seen fit to dismiss him for misconduct—a decision we affirm here.  To do so would contravene the purpose of Federal Rules of Civil Procedure 41(b) and 16(f) and undermine the district court's authority to punish contemptuous and abusive conduct.

For these reasons, we affirm.

**AFFIRMED.**